# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

## MACOMB COUNTY v AFSCME COUNCIL 25 LOCALS 411 AND 893

Docket No. 144303. Argued March 5, 2013 (Calendar No. 2). Decided June 12, 2013.

AFSCME Council 25 Locals 411 and 893, the International Union UAW Locals 412 and 889, and the Michigan Nurses Association filed unfair labor practice complaints with the Michigan Employment Relations Commission (MERC) against Macomb County, the Macomb County Road Commission, and the 16th Judicial Circuit Court, asserting that by changing the method for calculating pension benefits, respondents had lowered their pension benefits without bargaining on the issue as required by the public employment relations act (PERA), MCL 423.201 *et seq*. The parties' collective-bargaining agreements (CBAs) provided employees with various pension-plan options, including one in which payments terminated at the death of the employee (straight-life pension) and another in which pension benefits continued until the death of both the employee and his or her beneficiary (joint-and-survivor pension). A Macomb County Retirement Ordinance mandated that the optional joint-and-survivor benefit be the actuarial equivalent of the standard straight-life benefit. In 1982, respondents switched from using gender-based actuarial tables to calculate the joint-and-survivor benefit to using a female actuarial table for all retirees. In 2006, respondents adopted a different mortality table for calculating those benefits after determining that use of the female mortality table resulted in higher pension benefits for those employees who chose the joint-and-survivor option. The hearing referee recommended that the MERC dismiss the unfair labor practice charge. She determined that a retirement plan's actuarial assumptions were mandatory subjects of bargaining under the PERA, but concluded that the duty to bargain had been satisfied because the CBAs covered the issue of retirement benefit calculations and the parties had agreed to have those benefits calculated as provided in the retirement ordinance. The referee determined that although the term "actuarially equivalent" in the ordinance was a matter of contract interpretation, the issue should be resolved through the grievance arbitration procedures, and did not constitute an unfair labor practice. The charging parties filed exceptions to the hearing referee's proposed decision and the MERC rejected the recommendation, concluding that the actuarial assumptions at issue were never memorialized in the retirement ordinance or any of the CBAs referring to the ordinance. The MERC reasoned that although the ordinance did not define the phrase "actuarial equivalent," the parties had tacitly agreed to continue the use of the female actuarial table and that respondent's change in the table used violated the duty to bargain. In a split opinion, the Court of Appeals, FITZGERALD and SHAPIRO, JJ., MARKEY, P.J., dissenting, affirmed the MERC's decision, 294 Mich App 149 (2011), concluding that actuarial assumptions were mandatory subjects of bargaining, that the term actuarial equivalence did not unambiguously mean equal in value and that the parties' past practice of using the female actuarial table

constituted a tacit agreement to continue using it absent modification by collective bargaining. The Supreme Court granted respondents' application for leave to appeal. 491 Mich 915 (2012).

In an opinion by Chief Justice YOUNG, joined by Justices MARKMAN, KELLY, and ZAHRA, the Supreme Court *held*:

Disputes over the terms or conditions of employment that are covered by a CBA are subject to arbitration through the grievance process. When the CBA grants the retirement commission discretion to use actuarial tables to establish pension benefits, the commission's decision to alter a long-standing method used to calculate those benefits, by itself, does not constitute the clear and unmistakable evidence necessary to overcome the CBA's coverage and the change in calculation method does not create a new term or condition of employment that would trigger the need to bargain. Instead, the remedy for this dispute lies in the grievance and arbitration system that the parties chose to adopt.

1. MCL 423.215(1) requires a public employer to engage in collective bargaining with its employees with respect to wages, hours, and other terms and conditions of employment; the calculation of retirement benefits is a mandatory subject of collective bargaining. While the parties do not need to reach an agreement on a subject of mandatory collective bargaining, neither party may take unilateral action on the subject absent an impasse in the negotiation. When the parties reach a negotiated agreement for a provision in the CBA that fixes the parties' rights, further mandatory bargaining is foreclosed because the matter is covered by the agreement and because the parties must be able to rely on their agreements. In determining whether the MERC may resolve an unfair labor practice claim involving a breach of contract, it initially must determine whether the subject of the claim is covered by the contract. If a CBA covers the term or condition in dispute, then the details and enforceability of the provision are left to arbitration through the grievance process that the parties agreed to and memorialized in the CBA. As a result, when the parties have agreed to a separate grievance or arbitration process, the MERC's review of a CBA in the context of a refusal-to-bargain claim is limited to determining whether the agreement covers the subject of the claim. In this case, UAW 412, Units 39, 46, 49, 55, and 75, UAW Local 889, AFSCME Local 411, and the Michigan Nursing Association's CBAs incorporate the terms of the retirement ordinance in the definition of retirement benefits. As a result, those charging parties' claims challenging the change in the long-standing method used to calculate pension benefits are covered by the CBAs and the grievance procedure is the appropriate avenue to determine the charging parties' rights under their respective CBAs. In addition, the Macomb County Road Commission and AFSCME Local 893 CBA implicitly incorporated the retirement ordinance to the extent that the ordinance governs optional joint-and-survivor benefits and the grievance procedure is the appropriate forum in which to challenge the calculation of those pension benefits as well.

2. A charging party may pursue an unfair labor practice complaint regarding the changing of a term or condition of employment even when a CBA controls, but only when the new term or condition amounts to an amendment of the CBA. Where a party claims that an employer unilaterally changed a term or condition of employment that is covered by unambiguous language in the CBA, that party must present clear and unmistakable evidence establishing the parties' affirmative intent to revise the CBA and establish new terms or

conditions of employment; doubt about whether a subject matter is covered should be resolved in favor of having the parties arbitrate the dispute, not the MERC. The charging party must show that the parties had a meeting of the minds with regard to the new terms or conditions such that there was an agreement to modify the contract. An affirmative intent to revise the terms of the CBA must be shown; a past practice must be so widely acknowledged that it creates an amendment to the contract. In this case, the retirement ordinance expressly provides the retirement commission with discretion to adopt actuarial calculations that apply to the retirement system. The commission's decision to alter a long-standing method used to calculate pension benefits, by itself, does not constitute the clear and unmistakable evidence necessary to overcome the CBA's coverage and the change in calculation method does not create a new term or condition of employment that would trigger the need to bargain. There was no evidence of a mutual commitment that the retirement commission would continue using the female actuarial table. In addition, the description in the CBA of the current actuarial table does not indicate an intent to limit the retirement commission's discretion to adopt a different table in the future and does not create an ambiguity in their discretion to make such changes.

3. Doubt about whether a subject matter is covered by the CBA is resolved in favor of having the parties arbitrate the dispute. The arbitrator, not the MERC, is best equipped to decide whether a past practice has matured into a new term or condition of employment for purposes of a CBA. In this case, the Court of Appeals erred by affirming the MERC decision that the respondents violated the terms of the CBAs when they changed the actuarial table used to calculate pension benefits. The retirement ordinance grants the retirement commission discretion to adopt actuarial calculations that apply to the retirement system. When calculating pension benefits, actuarial equivalence is a term of art that unambiguously means a benefit of equal value. Because the ordinance requires that the pension benefits be actuarially equivalent, the commission properly altered the long-standing method used to calculate the optional joint-and-survivor benefit to ensure that they were equal in value to those received for straight-life benefits.

Reversed and remanded to the MERC for dismissal of the charging parties' unfair labor practice claims.

Justice MCCORMACK, joined by Justice CAVANAGH, dissenting, would have affirmed the Court of Appeals' decision and concluded that the parties' 24-year intentional practice of using a very specific formula for achieving actuarial equivalence amended the contract and required bargaining anew before a unilateral change could be made. Although actuarial equivalence is an unambiguous term of art, the retirement commission knew that the 100% female/0% male mortality table would not achieve actuarial equivalence. On the suggestion of the actuarial firm, the retirement commission amended the retirement ordinance to indicate a specific interest rate and data set that referred to the 100% female/0% male mortality table. This deliberate choice and longstanding past practice thereby modified the unambiguous CBA language.

Justice VIVIANO took no part in the decision of this case because he was the Chief Judge of the 16th Judicial Circuit Court before his appointment to this Court.

©2013 State of Michigan

# Opinion

Chief Justice:          Justices:

Robert P. Young, Jr.    Michael F. Cavanagh
                        Stephen J. Markman
                        Mary Beth Kelly
                        Brian K. Zahra
                        Bridget M. McCormack
                        David F. Viviano

FILED JUNE 12, 2013

STATE OF MICHIGAN

SUPREME COURT

MACOMB COUNTY, MACOMB
COUNTY ROAD COMMISSION, and
16TH JUDICIAL CIRCUIT COURT,

      Respondents-Appellants,

V                        No. 144303

AFSCME COUNCIL 25 LOCALS 411 and
893, INTERNATIONAL UNION UAW
LOCALS 412 and 889, and MICHIGAN
NURSES ASSOCIATION,

      Charging Parties-Appellees.

BEFORE THE ENTIRE BENCH (except VIVIANO, J.)

YOUNG, C.J.

The public employment relations act (PERA)[1] requires public employers to bargain with their employees' designated representatives concerning the "terms and conditions of employment," including the calculation of retirement benefits. Failure to

---

[1] MCL 423.201 *et seq.*

do so constitutes an unfair labor practice. The unfair labor practice complaints at issue in this case arise out of the Macomb County Retirement Commission's decision to change the actuarial table used to calculate joint and survivor retirement benefits for employees retiring after July 1, 2007. We hold that the respondents did not commit an unfair labor practice when they refused to bargain with the charging parties over this decision and that the remedy for this dispute lies in the grievance and arbitration system these parties have created.

If a collective bargaining agreement covers the term or condition of employment in dispute, "the details and enforceability of the provision are left to arbitration."[2] The unfair labor practice complaints in this case concern subject matters covered by the collective bargaining agreements. Thus, the grievance process contemplated in the collective bargaining agreements is the appropriate avenue to challenge respondents' actions. The collective bargaining agreements grant the retirement commission discretion to establish actuarial tables to calculate joint and survivor benefits. The retirement commission's 24-year practice of using the same actuarial table to calculate those benefits does not, on its own, constitute the clear and unmistakable evidence necessary to overcome the collective bargaining agreements' coverage of the matter and create a new term or condition of employment. As a result, none of the unfair labor practice charges can be sustained. We reverse the decision of the Court of Appeals and remand this case to the Michigan Employment Relations Commission for dismissal of the unfair labor practice complaints.

---

[2] *Port Huron Ed Ass'n v Port Huron Area Sch Dist*, 452 Mich 309, 321; 550 NW2d 228 (1996).

## I. FACTS AND PROCEDURAL HISTORY

The Macomb County Board of Commissioners enacted the retirement ordinance and established the Macomb County Employees Retirement System to "provid[e] pension and retirement benefits for the employees of the County of Macomb . . . ."[3] The ordinance vests the seven-member Macomb County Retirement Commission with "the general administration, management and responsibility for the proper operation of the Retirement System, and for construing and making effective the provisions of [the] Ordinance."[4]

The retirement ordinance grants a retiring county employee the option of receiving a monthly retirement allowance payable only until the employee's death, or receiving a reduced allowance during the retiree's life, the payment of which continues after this death and through the life of a named beneficiary.[5] If the retiree chooses to allow a surviving beneficiary to receive payments in addition to his or her own "straight life benefit," the monthly "joint and survivor" payment is reduced to ensure that it is "the actuarial equivalent . . . of [the employee's] straight life retirement allowance . . . ."[6] The retirement ordinance does not define the term "actuarial equivalent."

---

[3] Macomb County retirement ordinance, § 1.

[4] *Id*. at § 3.

[5] Section 22(b) of the Macomb County retirement ordinance conditions a union represented employee's benefits on those "provided in the applicable collective bargaining agreement . . . ."

[6] Macomb County retirement ordinance, § 26(a). The ordinance lists five separate options, with varying benefits that the surviving beneficiary would receive.

This case focuses on the method that the retirement system uses to calculate the joint and survivor benefit as compared to the straight life benefit. Until 1982, the county used gender-based actuarial tables to calculate the joint and survivor benefit. However that year, in response to a United States Supreme Court decision[7] and a Michigan Attorney General opinion,[8] the commission concluded that it could not continue to use gender-based actuarial tables. It sought the advice of its actuary, Gabriel, Roder, Smith & Company (GRS), in selecting a single, gender-neutral actuarial table to calculate the joint and survivor payment without regard to either the employee's or the beneficiary's gender. GRS outlined several alternative approaches and noted that the only approach "designed to make sure that no participant will receive a lesser benefit than under [existing] procedures," would be to adopt the female actuarial table for all retirees. Ultimately, the retirement commission chose to adopt the female actuarial table for all retirees.

For 24 years, the retirement system applied the female actuarial table when calculating its retirees' monthly joint and survivor payments. However, GRS studied the retirement system over a five-year period (2001-2005) and concluded that the joint and survivor benefit was "more valuable than the single life annuity form of payment." To ensure that the optional joint and survivor payment would "have the same present value, on average, as the straight life normal form of payment," GRS proposed a different

---

[7] *City of Los Angeles Dept of Water & Power v Manhart*, 435 US 702; 98 S Ct 1370; 55 L Ed 2d 657 (1978).

[8] OAG, 1981-1982, No 5846, p 29 (January 22, 1981).

actuarial table for the commission to adopt. GRS determined that a blended table that assumed 60% male retirees and 40% female retirees would best approximate benefits that are equal in value among all the options. At its November 17, 2006 meeting, the commission voted 4-3 to adopt this 60% male actuarial table, to take effect for all employees who retire on or after July 1, 2007.[9]

The charging parties demanded collective bargaining over the change.[10] Respondents rejected this demand and claimed that the existing collective bargaining agreements gave the commission discretion to adopt new actuarial tables.[11] The charging

---

[9] Any employees who retired before July 1, 2007, were unaffected by the decision and continued to receive benefits as calculated from the female actuarial table.

[10] The charging parties are: AFSCME Council 25, Locals 411 and 893; International Union UAW Locals 412 and 889; and Michigan Nurses Association.

[11] The respondents are: Macomb County, Macomb County Road Commission, and 16th Judicial Circuit Court. This case involves nine separate collective bargaining agreements between the charging parties and the respondents, each admitted as exhibits in the hearing before the hearing referee. Article 26(A) of the collective bargaining agreement between UAW Local 412, Unit 75 and Macomb County states that

> [t]he Employer shall continue the benefits as provided by the presently constituted Macomb County Employees' Retirement Ordinance, and the Employer and the employee shall abide by the terms and conditions thereof, provided, that the provisions thereof may be amended by the Employer as provided by the statutes of the State of Michigan . . . .

An identical provision appears in seven of the other collective bargaining agreements: between UAW Local 889 and Macomb County, between AFSCME Local 411 and Macomb County, between the Michigan Nurses Association and Macomb County, and between four additional bargaining units of UAW Local 412 and Macomb County. The collective bargaining agreement between AFSCME Local 893 and the Macomb County Road Commission referred to the ordinance in outlining health and life insurance benefits and to "retirement benefit option[s]" in outlining a surviving spouse's health insurance benefits.

parties then filed unfair labor practice complaints with the Michigan Employment Relations Commission (MERC).

After conducting a three-day hearing, the hearing referee recommended that the MERC dismiss the unfair labor practice charges. She determined that a retirement plan's actuarial assumptions are mandatory subjects of bargaining under the PERA. However, because the underlying collective bargaining agreements "contain extensive provisions 'covering' pension benefits," and because "the parties were satisfied, and agreed, to have these benefits calculated as provided in the ordinance," she concluded that the respondents had already fulfilled their statutory duty to bargain over the retirement system's actuarial assumptions. While "the meaning of the term 'actuarial equivalent' in the ordinance involved bona fide questions of contract interpretation," those questions "are properly subject to resolution through the grievance arbitration procedures set out in the parties' contracts," not in litigation over unfair labor practices.

The charging parties filed exceptions to the hearing referee's proposed decision.[12] The MERC agreed with the charging parties and rejected the referee's decision and

_____

[12] A hearing referee's proposed decision "shall be considered by the commission only if raised in exceptions or cross exceptions to the proposed decision and recommended order filed under R 423.176." Mich Admin Code, R 423.161(6). Mich Admin Code, R 423.176 provides that "[a]ny party may file written exceptions to the decision and recommended order of the administrative law judge, or to any other part of the record or proceedings, including rulings upon motions or objections, and a brief in support thereof." Although Teamsters Local 214 was initially a charging party against respondent 16th Judicial Circuit Court, it did not file exceptions to the hearing referee's decision pursuant to Rule 423.176. Accordingly, the MERC adopted the hearing referee's decision and recommended order as to Teamsters Local 214. MERC Case No. C07 E-111 (January 25, 2010).

6

recommended order. It concluded that "[t]he actuarial assumptions at issue here were never memorialized in the Retirement Ordinance or any of the collective bargaining agreements referencing the Retirement Ordinance." Although the ordinance did not define the actuarially equivalent benefits promised to retirees and their beneficiaries, the term's meaning "has been subordinated to the question of whether the parties have amended their agreements by the longstanding practice of calculating optional pension benefits that are not the actuarial equivalent of straight life benefits . . . ." On this question, the MERC determined that the parties "tacitly agreed that joint and survivor benefits would continue to be calculated as they had [been] in the past." As a result, the MERC concluded that respondents' unilateral change violated the duty to bargain and that respondents must revert to the female actuarial table.[13]

The Court of Appeals affirmed the MERC's decision in a split opinion.[14] The majority agreed with the MERC that actuarial assumptions are mandatory subjects of bargaining, that "the term 'actuarial equivalence' as used in this case did not unambiguously mean 'equal in value,'"[15] and that the parties' past practice of using the

---

[13] The MERC held that respondents could only change the actuarial table if the parties agreed to a different actuarial table or if, upon expiration of the existing collective bargaining agreements, the parties' good faith bargaining over the actuarial table reached an impasse. The MERC also ordered respondents to recalculate the joint and survivor benefits of any retiree whose benefits were reduced under the new actuarial table; to compensate them, with interest, for the reduction in benefits it had already paid; and to post a notice indicating their intent to comply with the ruling.

[14] *Macomb Co v AFSCME Council 25 Locals 411 & 893*, 294 Mich App 149; 818 NW2d 384 (2011).

[15] *Id*. at 165.

female actuarial table "constituted a 'tacit agreement'" to continue using it absent collective bargaining.[16] The majority further concluded that the continuous use of the female actuarial table "was 'so widely acknowledged and mutually accepted that it created an amendment to the contract,'" even if the County's definition of "actuarial equivalence" unambiguously intended to establish options that were equal in value.[17]

The dissenting judge would have reversed the MERC's decision and would have adopted the hearing referee's recommended order. The dissenting judge believed that the term "actuarial equivalent" is unambiguous and required "optional retirement benefits [to] be equivalent or equal in value on the basis of actuarial assumptions."[18] Because it "results in the optional benefits being more valuable than the straight-life benefit,"[19] the dissent opined that using the female actuarial table for all employees was inconsistent with the ordinance. The dissent further reasoned that by agreeing to incorporate the ordinance into their collective bargaining agreements, the employees' "retirement benefits and the methods used to calculate them—including mortality tables and actuarial assumptions—are 'covered by' the parties' CBAs," and do not require further bargaining.[20]

---

[16] *Id*. at 166.

[17] *Id*. at 170, quoting *Port Huron Ed Ass'n v Port Huron Area Sch Dist*, 452 Mich 309, 329; 550 NW2d 228 (1996) (brackets omitted).

[18] 294 Mich App at 178 (MARKEY, P.J., dissenting).

[19] *Id*.

[20] *Id*. at 184 (MARKEY, P.J., dissenting). Judge MARKEY alternatively concluded that actuarial assumptions are not subject to mandatory bargaining in the first instance because the commission "is vested with the authority to determine mortality tables and

8

We granted respondents' application for leave to appeal and ordered the parties to brief "whether the Court of Appeals properly applied the holding of *Port Huron Ed Ass'n v Port Huron Area Sch Dist*, 452 Mich 309 (1996), when it concluded that the parties intended to modify the collective bargaining agreement by use of the 100% female/ 0% male mortality tables."[21]

## II. STANDARD OF REVIEW

In a case on appeal from the MERC, the MERC's factual findings are conclusive if supported by "competent, material, and substantial evidence on the whole record."[22] Legal questions, which include questions of statutory interpretation[23] and questions of contract interpretation,[24] are reviewed de novo.[25] As a result, an administrative agency's legal rulings "are set aside if they are in violation of the constitution or a statute, or affected by a substantial and material error of law."[26]

---

actuarial assumptions necessary to ensure 'actuarial equivalence' of optional requirement benefits . . . ." *Id.* at 172 (MARKEY, P.J., dissenting). However, respondents do not raise this threshold issue on appeal. Moreover, this Court has held that the calculation of retirement benefits is a matter of mandatory collective bargaining. *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 63; 214 NW2d 803 (1974).

[21] 491 Mich 915 (2012).

[22] Const 1963, art 6, § 28. *Amalgamated Transit Union, Local 1564, AFL-CIO v Southeastern Mich Transp Auth*, 437 Mich 441, 450; 473 NW2d 249 (1991).

[23] *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 102; 754 NW2d 259 (2008).

[24] *In re Egbert R Smith Trust*, 480 Mich 19, 24; 745 NW2d 754 (2008).

[25] *Little v Hirschman*, 469 Mich 553, 557; 677 NW2d 319 (2004).

[26] *Amalgamated Transit Union*, 437 Mich at 450.

9

## III. ANALYSIS

The PERA governs the relationship between public employees and governmental agencies.[27] When it was enacted in 1976,[28] the PERA "drastically altered public employee labor relations in Michigan."[29] It represents the Legislature's intent to "assure[] public employees of protection against unfair labor practices, and of remedial access to a state-level administrative agency with special expertise in statutory unfair labor practice matters."[30]

Section 15(1) of the PERA requires a public employer to engage in collective bargaining with its employees' designated representatives "with respect to wages, hours, and other terms and conditions of employment . . . ."[31] This Court has held that the

---

[27] The PERA applies to any "any person holding a position by appointment or employment in the government of this state, in the government of 1 or more of the political subdivisions of this state, in the public school service, in a public or special district, in the service of an authority, commission, or board, or in any other branch of the public service," subject to exceptions not applicable in this case. MCL 423.201(1)(e).

[28] 1976 PA 18; MCL 423.201 *et seq*.

[29] *The Lamphere Sch v Lamphere Federation of Teachers*, 400 Mich 104, 116; 252 NW2d 818 (1977). The PERA amended the Hutchinson Act, 1947 PA 336, which "had prohibited public employees from engaging in collective bargaining. The PERA not only permitted collective bargaining by employees, see [MCL 432.09], but it [also] required public employers to negotiate with public employees' bargaining units, see [MCL 432.10]." *Id*.

[30] *Detroit Fire Fighters Ass'n v Detroit*, 408 Mich 663, 684; 293 NW2d 278 (1980).

[31] MCL 423.215(1). Section 15(1) of the PERA covers similar subjects of mandatory collective bargaining as § 8(d) of the National Labor Relations Act. 29 USC 158(d) (requiring covered employers to bargain "with respect to wages, hours, and other terms and conditions of employment"). See *Detroit Police Officers Ass'n*, 391 Mich at 53 ("The decision by the Michigan Legislature to adopt the language of § 8(d) of the NLRA is significant.").

calculation of retirement benefits is a mandatory subject of collective bargaining.[32] Section 10(1) specifies that "[i]t shall be unlawful for a public employer . . . to refuse to bargain collectively with the representatives of its public employees."[33] This duty "persists during the life of the collective bargaining agreement."[34] A violation of § 10(1) "shall be deemed to be [an] unfair labor practice[] remediable by the [MERC]."[35]

This Court's caselaw explains the PERA's requirement to engage in collective bargaining: "The primary obligation placed upon the parties in a collective bargaining setting is to meet and confer in good faith."[36] Good faith requires a party to be "actively engaged in the bargaining process with an open mind and a sincere desire to reach an agreement."[37] While the parties do not need to reach an agreement on a subject of mandatory collective bargaining, "neither party may take unilateral action on the subject absent an impasse in the negotiations."[38]

In *Port Huron Education Association v Port Huron School District*, we examined the statutory duty to bargain in the context of an existing, controlling collective bargaining agreement. An employer "can fulfill its statutory duty by bargaining about a

---

[32] *Detroit Police Officers Ass'n*, 391 Mich at 63.

[33] MCL 423.210(1)(e).

[34] *Amalgamated Transit Union*, 437 Mich at 449-450.

[35] MCL 423.216.

[36] *Detroit Police Officers Ass'n*, 391 Mich at 53.

[37] *Id*. at 53-54.

[38] *Id*. at 55.

subject and memorializing resolution of that subject in the collective bargaining agreement."[39] When the parties "'negotiat[e] for a provision in the collective bargaining agreement that fixes the parties' rights,'" they "'foreclose[] further mandatory bargaining'" because "the matter is 'covered by' the agreement."[40]

The foundational principle of our contract jurisprudence is that parties must be able to rely on their agreements.[41] This principle applies no less strongly to collective bargaining agreements: when parties to a collective bargaining agreement "'bargain about a subject and memorialize the results of their negotiation in a collective bargaining agreement, they create a set of enforceable rules—a new code of conduct for themselves—on that subject.'"[42] A party to the collective bargaining agreement "has a right to rely on the agreement as the statement of its obligations on any topic 'covered by' the agreement."[43]

The MERC ordinarily "does not involve itself with contract interpretation when the agreement provides a grievance process that culminates in arbitration."[44] However,

---

[39] *Port Huron Ed Ass'n*, 452 Mich at 317-318.

[40] *Id*. at 318, quoting *Local Union No 47, Int'l Brotherhood of Electrical Workers v NLRB*, 288 US App DC 363, 368; 927 F2d 635 (1991).

[41] See, e.g., *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 52; 664 NW2d 776 (2003) ("The notion, that free men and women may reach agreements regarding their affairs without government interference and that courts will enforce those agreements, is ancient and irrefutable.").

[42] *Port Huron Ed Ass'n*, 452 Mich at 319, quoting *Dep't of Navy v Fed Labor Relations Auth*, 295 US App DC 239, 248; 962 F2d 48 (1992).

[43] *Port Huron Ed Ass'n*, 452 Mich at 327.

[44] *Id*. at 321.

when a charging party claims that a respondent has failed to bargain over a mandatory subject of bargaining, the MERC must "determine whether the agreement 'covers' the dispute."[45] As a result, "it is often necessary for the MERC . . . to review the terms of an agreement to ascertain whether a party has breached its statutory duty to bargain."[46] If the agreement covers "the term or condition in dispute," then "the details and enforceability of the provision are left to arbitration."[47] The MERC itself has recognized this limitation on its scope of authority,[48] which we reaffirm today: when the parties have agreed to a separate grievance or arbitration process, the MERC's review of a collective bargaining agreement in the context of a refusal-to-bargain claim is limited to determining whether the agreement covers the subject of the claim.

In *Port Huron*, the charging party also claimed that, notwithstanding a collective bargaining agreement that covered the matter in dispute, the parties' course of conduct created a *new* term or condition of employment that existed independently from the collective bargaining agreement. While this Court reviewed the parties' course-of-

---

[45] *Id*.

[46] *Id*.

[47] *Id*. "[A]rbitration has come to be the favored procedure for resolving grievances in federal and Michigan labor relations . . . ." *Grand Rapids v Grand Rapids Lodge No 97, Fraternal Order of Police*, 415 Mich 628, 634; 330 NW2d 52 (1982). However, "[t]he preference for arbitration . . . is triggered only if the parties agree to arbitrate." *Id*.

[48] See *St Clair Co Rd Comm v Local 516M Serv Employees Int'l Union*, 1992 MERC Labor Op 533, 538 ("Where there is a contract covering the subject matter of a dispute, which has provisions reasonably relied on for the action in question, and the contract also has a grievance procedure with final and binding arbitration, the Commission finds that the contract controls and no PERA issue is presented.").

conduct claim separately from the collective bargaining agreement, we underscore that it is incumbent on courts and the MERC not to conflate an unfair labor practice complaint with an arbitrable disagreement over the terms of the collective bargaining agreement. Unambiguous language in a collective bargaining agreement dictates the parties' rights and obligations even in the face of a conflicting past practice, "unless the past practice is so widely acknowledged and mutually accepted that it creates an amendment to the contract."[49] The party that seeks to overcome unambiguous contract language "must show the parties had a meeting of the minds with respect to the new terms or conditions so that there was an agreement to modify the contract."[50]

We clarify the *Port Huron* analysis to explain that this is an exceedingly high burden to meet. Any lesser standard would defeat the finality in collective bargaining agreements and would blur the line between statutory unfair labor practice claims and arbitrable disagreements over the interpretation of collective bargaining agreements. As a result, the party that seeks to overcome an unambiguous collective bargaining agreement must present evidence establishing the parties' affirmative intent to revise the collective bargaining agreement and establish new terms or conditions of employment. Moreover, because "arbitration has come to be the favored procedure for resolving grievances in federal and Michigan labor relations,"[51] doubt about whether a subject

---

[49] *Port Huron Ed Ass'n*, 452 Mich at 329. When the collective bargaining agreement is ambiguous or silent on the subject, "there need only be 'tacit agreement that the practice would continue.'" *Id.* at 325, quoting *Amalgamated Transit Union*, 437 Mich at 454-455.

[50] *Port Huron Ed Ass'n*, 452 Mich App at 312.

[51] *Grand Rapids*, 415 Mich at 634.

14

matter is covered should be resolved in favor of having the parties arbitrate the dispute. The arbitrator, not the MERC, is ordinarily best equipped to decide whether a past practice has matured into a new term or condition of employment.

## IV.  APPLICATION

At issue in this case is whether respondents were required to bargain with the charging parties before the retirement commission changed the actuarial tables used to calculate joint and survivor monthly payments.  The parties do not dispute that the calculation of retirement benefits is a matter of mandatory collective bargaining.[52] However, respondents claim that the retirement ordinance unambiguously gave the commission the discretion to change the actuarial tables used to calculate joint and survivor benefits and, moreover, that they satisfied the duty to bargain because the collective bargaining agreements, in turn, incorporate the ordinance's provisions authorizing this discretion.  The charging parties dispute that characterization of the collective bargaining agreement and instead claim that the respondents' use of the female actuarial table for 24 years created a separate and enforceable term of employment that could not be changed absent additional collective bargaining.

### A.  THE RETIREMENT ORDINANCE

The Macomb County Retirement Ordinance explicitly provides the retirement commission with discretion to adopt actuarial calculations that apply to the retirement system: "The Retirement Commission shall from time to time adopt such mortality and

---

[52] *Detroit Police Officers Ass'n*, 391 Mich at 63.

other tables of experience, and a rate or rates of regular interest, as are necessary in the

Retirement System on an actuarial basis."[53]   When an employee selects the joint and

survivor option to allow a beneficiary to receive monthly retirement allowance payments

after the employee's death, the ordinance requires the monthly payments to be reduced so

that the joint and survivor option is "the actuarial equivalent" of the straight life benefit.[54]

The ordinance does not define the term "actuarial equivalent."  Because "actuarial

equivalent" is a term of art, we must assume that the Macomb County Retirement

Commission intended the term to have its technical meaning.[55]  Black's Law Dictionary

defines "actuarial equivalence" as "[t]he amount of accrued pension benefits to be paid

monthly or at some other interval so that the total amount of benefits will be paid over the

---

[53] Macomb County Retirement Ordinance, § 15.

[54] Section 26(a) of the Macomb County Retirement Ordinance provides:

> Prior to the receipt of his/her first monthly retirement payment but not thereafter, a member may elect to receive his/her retirement allowance as a straight life retirement allowance payable throughout his/her life or he/she may elect to receive the actuarial equivalent, at that time, of his/her straight life retirement allowance in a reduced retirement allowance payable throughout his/her life and nominate a beneficiary. . . .

The beneficiary then would receive payments on his or her survival of the employee on the basis of the particular provisions of the five options listed.  Moreover, § 22(b) allows a union represented member to "elect to receive his/her retirement allowance under an option provided in Section 26 in lieu of a straight life retirement allowance."

[55] See MCL 8.3a ("[T]echnical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning."); *Gora v City of Ferndale*, 456 Mich 704, 711; 576 NW2d 141 (1998) ("The rules governing the construction of statutes apply with equal force to the interpretation of municipal ordinances.").

16

expected remaining lifetime of the recipient."[56] This definition makes clear that an actuarially equivalent monthly benefit must be calculated to allocate benefits over a projected period of time, that is, the life expectancy of the recipient(s). The Attorney General reached a similar conclusion in the opinion that prompted the commission's original action to adopt a female-only actuarial table. When defining the phrase "actuarially equivalent" in the statutory election of early retirement benefits, the Attorney General stated that the term meant a "'benefit of equal value'" to its comparison plan "'when computed upon the basis of such mortality and other tables as may be adopted by the retirement board.'"[57] We believe that the Attorney General's construction accurately describes this technical term and thus we adopt it as our own.

Furthermore, we hold that this definition of "actuarial equivalent" is unambiguous in the context of the ordinance. The ordinance itself makes clear that the county must present the joint and survivor options to a retiring employee in a way that estimates that the employee and his or her beneficiary are projected to receive an equal amount of total benefits from a joint and survivor option as the employee would receive from the straight life option.

Moreover, it is also clear from the evidence in this case that the parties had this same understanding of the term's meaning. GRS's report states that the proposed actuarial table is "designed to have the same present value, on average, as the straight life

---

[56] Black's Law Dictionary (8th ed), p 39.

[57] OAG, 1981-1982, No 5846, p 31, quoting *King Co Employees' Ass'n v State Employees Retirement Bd*, 54 Wash 2d 1; 336 P2d 387, 391 (1959) (emphasis omitted).

17

normal form of payment" and states that the 100% female blend is not actuarially equivalent to the straight life payment. Indeed, the charging parties' own expert witness testified that "[a]ctuarially equivalent to me means equal" and "[i]dentical in value."[58] For these reasons, we conclude that the dissenting judge of the panel correctly determined that actuarial equivalence requires "optional benefits that include payments to a survivor be equal in value to the straight-life benefit on the basis of statistical data regarding mortality and other factors such as the rate of interest."[59]

---

[58] In concluding that the term "actuarial equivalent" is ambiguous, the Court of Appeals majority erroneously focused on a different statement by the charging parties' expert witness that distinguished actuarial equivalence from the valuation of benefits: "'[A]ctuarially equivalent is usually a term used in a plan document to set the optional forms to another optional form. The valuation of those optional forms is a different matter, whole different assumption set.'" *Macomb Co*, 294 Mich App at 164 (emphasis omitted). However, the extratextual evidence that the Court of Appeals majority used to define the ordinance's term did not refute the plain meaning of the term.

The expert noted that actuaries use gender-based actuarial tables when valuing future expected outlays for the purposes of valuing its pension obligations on the open market. He testified that "to value these benefits, they would value them as an open market valuation," which takes a recipient's sex into account, unlike the method used to define the recipient's benefits.

Thus, it is unremarkable for an expert to say that the county's own valuation of its pension obligations uses a different set of assumptions than its calculation of the pension benefits that are due its employees. This internal calculation is a more precise projection of its future pension funding obligations because, unlike the calculation of benefits due an employee, the county's internal calculation of its obligations can factor the differences in life expectancy between men and women.

[59] *Macomb Co*, 294 Mich App at 177 (MARKEY, P.J., dissent). Judge MARKEY interpreted the term "actuarial equivalent" by looking to the separate definitions of the terms "actuary" and "equivalent." However, as stated, the phrase "actuarial equivalence" is a term of art and as such has independent significance, as evidenced by its use in many similar retirement plans. See, e.g., *Dunn v Bd of Trustees of Wayne Co Retirement Sys*, 160 Mich App 384, 394; 407 NW2d 657 (1987) ("An employee pension . . . shall be the

18

## B. THE COLLECTIVE BARGAINING AGREEMENTS

While the ordinance clearly gives the commission discretion to maintain actuarially equivalent joint and survivor benefits, the ordinance is only effective as to unionized employees "as provided in the applicable collective bargaining agreement . . . ."[60] As a result, we must examine the individual collective bargaining agreements to determine whether they incorporate the ordinance's terms. Eight of the nine collective bargaining agreements at issue in this case expressly incorporate the terms of the retirement ordinance in the determination of retirement benefits.[61] They state identically that "[t]he Employer shall continue the benefits as provided by the presently constituted Macomb County Employees' Retirement Ordinance, and the Employer and the employee shall abide by the terms and conditions thereof, provided, that the provisions thereof may be amended by the Employer as provided by the statutes of the State of Michigan . . . ." Because the collective bargaining agreements cover the calculation of retirement benefits, we conclude that the grievance procedure is the appropriate avenue for the charging parties' claims arising out of the parties' rights under their respective collective bargaining agreement.[62]

---

actuarial equivalent of his accumulated contributions standing to his credit . . . .") (quotation marks and citation omitted).

[60] Macomb County Retirement Ordinance, § 22(b).

[61] The eight collective bargaining agreements containing identical language are those bargained by: UAW Local 412, Units 39, 46, 49, 55, and 75; UAW Local 889; AFSCME Local 411; and the Michigan Nurses Association.

[62] Each of these collective bargaining agreements specifies a grievance procedure. Six of the collective bargaining agreements provide a grievance procedure for "all disputes that may arise between [the parties] concerning the interpretation or operation of this

The ninth collective bargaining agreement—between the Macomb County Road Commission and AFSCME Local 893—implicitly incorporates the retirement ordinance. A subject "need not be explicitly mentioned in an agreement in order for the subject to be 'covered by' the agreement."[63]  In the context of retiree health care benefits, the Local 893 collective bargaining agreement states that "[h]ospital-medical coverage will be extended to a retiring Employee and spouse who qualifies and received [sic] benefits under the Macomb County Retirement Ordinance" and that this coverage "shall be discontinued upon the death of the retiree, unless the spouse continues to be entitled to and receive payment under a retirement benefit option."  Additionally, it states that "[e]mployees retiring from the Road Commission of Macomb County and eligible for benefits under the Macomb County Retirement Ordinance" shall receive a $10,000 life insurance benefit.  The collective bargaining agreement specifies the formula to calculate a retiree's pension benefits but, more important for the purposes of this case, it expressly refers to a "retirement benefit option" that allows a surviving beneficiary to receive benefits.  As a result, we hold that this collective bargaining agreement incorporates the retirement ordinance to the extent that the ordinance governs optional joint and survivor

Agreement."  The collective bargaining agreement between UAW Local 889 and Macomb County states that the grievance procedure applies to "all disputes, including but not limited to dismissals, suspensions, demotions and other disciplinary actions of any type that may arise between [the parties] concerning the interpretation or operation of this Agreement."  Finally, the collective bargaining agreement between UAW Local 412, Unit 46 and Macomb County states that a grievance is "a claim, reasonably, and sensibly founded, of a violation of this Agreement."

[63] *Port Huron Ed Ass'n*, 452 Mich at 322 n 16, citing *Dep't of Navy*, 295 US App DC at 252.

benefits and that the grievance procedure is the appropriate forum for the remaining charging party to raise its claim regarding disputes arising out of the collective bargaining agreement.[64]

## C. PAST PRACTICE

The parties have unambiguously expressed in the collective bargaining agreements their intent that the retirement ordinance governs the commission's discretion to amend the actuarial tables used to calculate joint and survivor benefits and to ensure that retirees enjoy actuarially equivalent benefits regardless of the option that they select. Nevertheless, the charging parties claim that the past practice of using the female actuarial table to calculate those benefits created a new term or condition of employment that exists independently from the collective bargaining agreement.

As stated, this Court's caselaw allows a charging party to raise an unfair labor practice complaint for changing a term or condition of employment even when a collective bargaining agreement controls, but only when the new term or condition amounts to an amendment of the collective bargaining agreement. However, overcoming an unambiguous provision in the collective bargaining agreement requires the charging parties to "show the parties had *a meeting of the minds* with respect to the new terms or conditions so that there was an agreement to modify the contract."[65] The past practice

---

[64] The collective bargaining agreement also supplies a grievance process "limited to a complaint or request of the grievant which involves the interpretation [or] application of, or compliance with, the provisions of this Agreement."

[65] *Port Huron Ed Ass'n*, 452 Mich at 312 (emphasis added).

must be "so widely acknowledged and *mutually accepted* that it creates an amendment to the contract."[66]

The evidence here does not establish more than the charging parties' unilateral expectation that the female actuarial table would continue to be used even if it were determined by the retirement commission that a different table would better effectuate the provisions of the retirement plan. The charging parties rely only on the fact that the female actuarial table has been used for more than two decades as dispositive of this issue. In *Gogebic Community College Michigan Educational Support Personnel Ass'n v Gogebic Community College*, the Court of Appeals ruled that the parties intended that the employer would have discretion to choose a dental insurance carrier because the collective bargaining agreement only articulated the benefits due employees.[67] There, testimony that the union's chief negotiator expected the employer to continue using a particular dental insurance carrier "does not amount to a 'meeting of the minds' that the employer would only use the [existing dental carrier] and falls far short of demonstrating conduct showing an unequivocal modification with 'definite, certain, and intentional' terms."[68]

*Gogebic* is instructive in this case. Indeed, our conclusion here is stronger than that in *Gogebic* because the ordinance expressly stated that the retirement commission

---

[66] *Id*. at 329 (emphasis added).

[67] *Gogebic Community College Mich Ed Support Personnel Ass'n v Gogebic Community College*, 246 Mich App 342; 632 NW2d 517 (2001).

[68] *Id*. at 354, quoting *Port Huron*, 452 Mich at 329.

has discretion to amend the actuarial table. Moreover, the parties negotiated the instant collective bargaining agreements before they took effect in 2005—after the retirement commission had been using the female actuarial table for 23 years. If the parties had intended to remove the discretion from the retirement commission's authority, they had ample opportunity to do so. The fact that the retirement commission chose not to exercise its discretion until 2006 does not overcome the parties' reaffirmation in their collective bargaining agreements of the discretion provided to the retirement commission in the ordinance.

The dissent argues that § 15 of the retirement ordinance establishes the parties' intent to enshrine the 100% female actuarial table as a term of employment, or at least creates an ambiguity regarding whether the retirement commission retained the discretion to adopt a different actuarial table. The dissent is wrong on both counts.

First, § 15 of the ordinance initially *reinforces* that the retirement commission has discretion to formulate an appropriate actuarial table.[69] Only then does this provision note that the retirement commission "is *currently* using . . . a blending of male and female rates."[70] This description of the current actuarial table does not in any way indicate the intent to limit the retirement commission's discretion to adopt a different actuarial table in the future, nor does it create an ambiguity in the retirement commission's discretion.[71]

---

[69] "The Retirement Commission shall from time to time adopt such mortality and other tables of experience, and a rate or rates of regular interest, as are necessary in the Retirement System on an actuarial basis." Macomb County Retirement Ordinance, § 15.

[70] *Id.* (emphasis added).

[71] In contrast to this case, the charging party in *Detroit Police Officers Ass'n v Detroit* provided evidence indicating that the employer admitted that the past practice was

Thus, § 15 does not negate—in fact, it reinforces—the retirement commission's discretion to establish actuarial tables.

Second, while the charging parties and dissent urge that the 100% female actuarial table was a bargained-for benefit that respondents could not unilaterally change, § 15 actually undercuts this argument. Rather than specifying with particularity that the retirement system was "currently using" the 100% female actuarial table, § 15 simply describes the then "current" actuarial table as a "blending of male and female rates." Accordingly, the dissent's reliance on § 15 is unfounded.

Finally, the UAW asserts that the retirement commission acknowledged that the actuarial table is a term or condition of employment and points to a statement in the minutes that the county's human resources director should "meet and confer (not meet and approve) with the unions regarding this change." However, assuming that the retirement commission's belief about the nature of these collective bargaining agreements was relevant, this statement actually belies the UAW's claim that the retirement commission acted with the understanding that the actuarial table was a term or condition of employment. The statement indicates that the commission was *not* looking for the unions' approval of the 60% male actuarial table but expected that the unions would be consulted about the change. The charging parties can point to no *mutual commitment* that the retirement commission would continue using the female actuarial table. As a result,

---

binding. *Detroit Police Officers Ass'n v Detroit*, 452 Mich 339, 347; 551 NW2d 349 (1996).

the commission's past practice of using the female actuarial table did not create a term or condition of employment independent from the collective bargaining agreements.

## V. CONCLUSION

Because the collective bargaining agreements at issue in this case cover the subject of the unfair labor practice claims, the respondents satisfied their statutory obligation to bargain over the calculation of retirement benefits and the appropriate forum for challenging implementation of the collective bargaining agreements is the grievance process that the agreements contemplate. Moreover, absent a mutual agreement, the mere lengthy use of the female actuarial table did not create a term or condition of employment independent of the collective bargaining agreements. Therefore, we reverse the Court of Appeals and remand this case to the MERC for dismissal of the charging parties' unfair labor practice claims.

Robert P. Young, Jr.
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra

STATE OF MICHIGAN

SUPREME COURT

MACOMB COUNTY, MACOMB
COUNTY ROAD COMMISSION, and
16TH JUDICIAL CIRCUIT COURT,

        Respondents-Appellants,

V

No. 144303

AFSCME COUNCIL 25 LOCALS 411 and
893, INTERNATIONAL UNION UAW
LOCAL 412 and 889, and MICHIGAN
NURSES ASSOCIATION,

        Charging Parties-Appellees.

MCCORMACK, J. (*dissenting*).

This case concerns the statutory duty to bargain about the calculation of retirement benefits under the public employment relations act (PERA), MCL 423.201 *et seq*. I agree with the majority that the calculation of retirement benefits is a mandatory subject of collective bargaining, that the calculation of retirement benefits is covered by the parties' collective bargaining agreements (CBAs), and that the term "actuarial equivalent" is unambiguous. Without evidence of a mutually agreed upon intentional practice that modified this unambiguous contract term, I would also agree with the majority about the outcome here. But I conclude that the parties' 24-year intentional practice of using a very specific formula for achieving "actuarial equivalence" amended the contract and requires

bargaining anew before a unilateral change may be made to that practice. Therefore I respectfully dissent and would affirm the Court of Appeals' judgment on this basis.

When there is a statutory duty to bargain under the PERA, the analysis from *Port Huron Ed Assoc v Port Huron Sch Dist*[1] applies when an unfair labor practice (ULP) is alleged. A public employer may defend against an ULP charge by fulfilling the statutory duty to bargain and memorializing the terms of that bargain in a CBA.[2] When an issue is covered by the CBA, the parties' past practice may amend the CBA, such that a public employer is nevertheless bound to bargain under PERA before making a unilateral change to that practice. When contract language is ambiguous or silent "there need only be tacit agreement that the practice would continue."[3] When the agreement is unambiguous with respect to the term affected by a conflicting practice, more is required. The contract language will control:

> [U]nless the past practice is so widely acknowledged and mutually accepted that it creates an amendment to the contract.
>
> While, to be sure, parties to a contract may modify it by a later agreement, . . . the conduct relied upon to show such modification must be unequivocal and the terms of modification must be definite, certain, and intentional.[4]

---

[1] *Port Huron Ed Assoc v Port Huron Sch Dist*, 452 Mich 309; 550 NW2d 228 (1996).

[2] *Id.* at 317-318.

[3] *Id.* at 325 (quotation marks and citation omitted).

[4] *Id.* at 329 (quotation marks and citation omitted).

As this Court explained in *Detroit Police Officers Ass'n v Detroit*, when applying the *Port Huron* analysis:

> The [*Port Huron*] majority approvingly cited a case that stated that the parties' agreement to modify the contract can be deduced from their course of conduct if it is unequivocal and the terms of modification are definite, certain, and intentional. Further, the majority indicated that the party seeking to supplant the contract language must prove that the other party intentionally chose to reject the negotiated contract and knowingly acted in accordance with the past practice.[5]

Thus, if the parties' *course of conduct* shows that they intentionally chose to modify a provision in the CBA because their past practice contradicted the plain meaning of that provision, a party to the CBA cannot later rely on the plain meaning of that provision and ignore the past practice.

Because I agree with the majority that the term "actuarial equivalent" is unambiguous, the charging parties in this case must meet a higher standard of proof to show that the parties' practice amended that contract term. They have done so. As the evidence of the parties' mutual agreement regarding the specific actuarial formula to be used to calculate retirement benefits is longstanding and substantial, I would hold that the charging parties have "submit[ted] proofs illustrating that the parties had a meeting of the minds with respect to the new terms or conditions—intentionally choosing to reject the negotiated contract and knowingly act in accordance with the past practice."[6] We have

---

[5] *Detroit Police Officers Ass'n v Detroit*, 452 Mich 339, 345; 551 NW2d 349 (1996) (citation omitted).

[6] *Id.*

3

guidance on whether the evidence relating to the past practice meets the higher standard given our past decisions. This case lies somewhere between the facts of *Port Huron* and *Detroit Police*. In those cases we addressed whether past practice modified unambiguous contract language, and we came to opposite conclusions.

In *Detroit Police*, this Court held that the past practice modified the unambiguous language of the contract.[7] The contract at issue there provided that the board of trustees would determine whether an incapacitation resulted from the performance of duty. However, the parties' longstanding practice was inconsistent with this language, such that the medical director would make the determination and the medical board's decision on the issue was subsequently binding on the board of trustees.[8] In 1991, the board of trustees attempted to recapture its authority to make the duty determination by unilaterally passing a resolution, resulting in the ULP charge.

In finding that the past practice modified the unambiguous contract language, this Court found the following facts to be important: (1) the board of trustees meeting minutes from prior years accepting decisions by the medical board as final and binding; (2) the city attorney's admission to the past practice; (3) the disapproval by the board's attorney of the resolution and reference to the 'current and well established practice' of the medical director making the decisions; (4) board member testimony that from 1983 to 1990 medical board decisions were regarded as final and binding; and (5) evidence that

---

[7] *Id.* at 341.

[8] *Id.* at 341-342.

4

the board developed forms for use by the medical board, which expressly indicated that the medical board was to make a "duty-connectedness finding."[9]

In contrast, in *Port Huron* this Court held that the past practice did not modify the unambiguous language of the contract. *Port Huron* concerned the proration of health insurance benefits for teachers hired midyear. A 1978 CBA had provided in unambiguous terms that such benefits would be prorated for midyear hires.[10] In the 1987-88 school year, the district hired 8 teachers midyear, prompting the school district to inform the new hires that their benefits would be prorated per the contract language.[11] This Court affirmed the Michigan Employment Relations Commission's determination that the school district's payments of full insurance benefits for midyear hires prior to 1987 was inadvertent, and that the teacher's association had not presented sufficient proof that "the district knowingly paid employees hired midyear insurance benefits for the entire summer in disregard of contract language to the contrary, with the intent that such payment would supplant the agreement."[12] Notably, the hearing officer found that "the district's failure to prorate benefits before 1988 was simply a mistake or

---

[9] *Id.* at 346-348.

[10] *Port Huron*, 452 Mich at 312.

[11] *Id.* at 313.

[12] *Id.* at 331.

oversight . . . .  There was no evidence the district was aware it had not followed the express language of the agreement."[13]

The facts regarding the practice at issue in this case are far closer to *Detroit Police* than to *Port Huron*.  The past practice of calculating optional pension benefits using a 100% female/0% male mortality table was certainly not a mistake and it was used for over two decades.[14]  At least one of the trustees of the retirement commission opposed the unilateral adoption of the new mortality table because of this longstanding practice.  Additionally, an actuarial study was conducted in 1993 and no action was taken to change the practice of using 100% female/0% male mortality tables as a result, even though the purpose of the study was to review the system's actuarial assumptions for calculating employer contributions and employee optional benefits.  This continued use of the 100% female/0% male tables after the previous study, given that formula's uneasy relationship with the term "actuarial equivalence," underscored the intentional commitment to that formula by the parties.

---

[13] *Id.* at 314-315.  Notably, "[t]he record is unclear whether there were any teachers hired for less than a full year before the 1983-84 school year.  From 1983 to 1987, however, eleven teachers were hired midyear."  *Id.* at 313.  In other words, the practice the charging parties cited may have only been in place a few years.

[14] The relevant time span in *Port Huron* was at most 10 years, whereas the time span in *Detroit Police* was potentially as long as 49 years.  Although the length of time is not a dispositive factor, it certainly bears on our analysis of whether a past practice is something that an employer merely "knew or should have known," as opposed to something that is more "definite, certain, and intentional."

6

The 100% female/0% male mortality table has never achieved actuarial equivalence; in fact, the parties selected it to accomplish other goals. Thus, while actuarial equivalence may have an unambiguous meaning, the application of that table was contrary to the plain meaning of that term, and the employers cannot now rely on the term's plain meaning when it is convenient or beneficial. Specifically, the 1982 actuarial study indicated that only a 100% female/0% male blend would be able to provide female employees with the same benefits they had received in the past, under gender-based tables which the parties agreed they could no longer use, because any other blend would reduce benefits to female employees.[15] The retirement commission did not want that result. These same issues were on the table in 1993 when the parties studied the actuarial tables again. That no change was adopted following the results of this 1993 study, even though the mortality table was still derived from the 1971 data and assumptions designed not to achieve actuarial equivalence but rather to give female employees the same benefits they had received under gender-based mortality tables, is further evidence that the practice of using the 100% female/0% male mortality table was deliberate and agreed on.

There is additional evidence that the practice of using the specific actuarial 100% female/0% male tables was intentional and not inadvertent. For example, the 1982

---

[15] The 1982 actuarial study states: "Instead of being designed to remove all cost of option election from the plan, the factors could be designed to make sure that no participant will receive a lesser benefit than under present procedures. To accomplish this, the present female factors would be used for all future retirants."

7

actuarial report that originally led the retirement commission to adopt the 100% female/0% male table contained the following statement:

> COMMENT C: The Retirement System Ordinance provides that an optional benefit will be "the actuarial equivalent" of the standard benefit. The Retirement Commission could adopt a rule stating that for purposes of determining amounts of optional benefits, the actuarial equivalent will be based upon a *stipulated interest rate and unisex mortality table*. This could eliminate the need for an ordinance change.

The report proposed a solution to the problem presented by the ordinance's stated goal of "actuarial equivalence" and the adopted practice's departure from that goal. The retirement commission took the study's recommendation and amended the retirement ordinance in 1982 to reflect the newly adopted 100% female/0% male actuarial assumptions:

> For purposes of determining actuarial [sic] equivalent Retirement Allowances, the Retirement Commission is currently using a 7 ½% interest rate and a blending of male and female rates based on the 1971 group annuity mortality table projected to 1984 with ages set back 2 years.[16]

This extremely specific language amended the retirement ordinance because the actuaries and the retirement commission trustees realized that the 100% female/0% male table they were committed to using posed a problem with respect to the trade definition of the term 'actuarial equivalent.' In other words, when the 1982 retirement commission decided to adopt a practice that would not achieve actuarial equivalence, it voluntarily amended the retirement ordinance to reflect this understanding. Likewise, the employers' decision to

---

[16] Section 15 of the Macomb County Retirement Ordinance.

8

apply the 100% female/0% male table was a "'definite, certain, and intentional'" action.[17] Deliberate action is evidence that the practice of using a 100% female/0% male table was "widely acknowledged and mutually accepted."

Although the 1982 actuarial study indicated that a 100% female/0% male mortality table was the only way for female retirees to continue to receive benefits at the rate they had been receiving them, the retirement commission could have chosen to adopt a mortality table that featured a different blend at less cost to the system, and which was more likely to achieve "actuarial equivalence," as the actuarial report made clear. Instead, the retirement commission decided to use a system that benefited female employees at a cost to actuarial equivalence.[18] If the retirement commission had wanted to retain *full* discretion to change the actuarial assumptions unilaterally, it would not have amended the ordinance with this language. This action is an even stronger indicator of intent than any cited in *Detroit Police*: Here, the parties' course of conduct was unequivocal and the terms of modification were definite, certain, and intentional.

The majority states that the retirement commission has always retained the *discretion* to elect how to determine actuarial equivalence, and I agree with the majority that § 15 of the Ordinance says as much.[19] But this is the same provision of the

---

[17] *Port Huron*, 452 Mich at 329 (citation omitted).

[18] The actuarial report specifically acknowledged that adopting a 100% female/0% male blend would probably impose a higher cost to the system. See n 16.

[19] Once a court has determined that an issue is covered by a CBA, the *Port Huron* analysis directs the court to determine whether that language is ambiguous. In this case,

retirement ordinance that specifically provides that the actuarial equivalence is to be determined "using a 7 ½% interest rate and a blending of male and female rates based on the 1971 group annuity mortality table projected to 1984 with ages set back 2 years," which reflects the 1982 amendment to the ordinance and the adoption of the 100% female/0% male mortality table.[20] It cannot be disputed that the amended § 15 language refers specifically to "the 1971 Group Annuity Mortality Table projected to 1984, for

---

the majority finds that "actuarial equivalent" is the relevant term for ambiguity analysis and that it is unambiguous. Unambiguous language will control unless the past practice is widely acknowledged and mutually accepted such that it amends the CBA itself. However, the majority opinion also finds that the retirement ordinance gives the retirement commission the unilateral discretion to change the actuarial assumptions: thus, *no* past practice can overcome the language of § 15. The majority conflates the issues: If the majority believes that the discretionary language of § 15 affects the past practice analysis, this language should also be scrutinized for ambiguity. Because the retirement ordinance specifically sets the actuarial assumptions at a definite interest rate and mortality table in § 15, I would find that the § 15 is ambiguous as to whether the retirement commission retains unilateral discretion in selecting actuarial assumptions. When there is ambiguous contract language, the parties' practice is evaluated under a "knew or should have known" standard. Under that standard, I would find that the respondents-appellants knew or should have known that the language of § 15 sacrificed the retirement commission's unilateral discretion in favor of setting "actuarial equivalent" to a benchmark that would not conflict with its trade definition. Contrary to the majority's position, when read *in full* instead of piecemeal, § 15 of the retirement ordinance is ambiguous as to whether the retirement commission has retained unilateral discretion to modify actuarial assumptions. Indeed, when read in full, § 15 is instead evidence that the retirement commission intentionally abandoned actuarial equivalence.

[20] Section 15 of the retirement ordinance. The majority's view that the adverb "currently" modifying the verb "using" indicates that the retirement commission retained unilateral discretion ignores a full reading of § 15. As previously explained, the entire second sentence of § 15 ("currently" included) is unnecessary if the majority is correct. Because the retirement ordinance sets actuarial equivalence to a set benchmark, I still find that the § 15 does not *unambiguously* grant the retirement commission unilateral discretion.

females, set back two years."[21] This 1971 data set formed the basis for the 100% female/0% male blend the parties began using after this amendment, underscoring that the amended language refers to the 100% female mortality table, as it is the only mortality table that is derived from the 1971 data set.

The retirement commission's practice of using an agreed upon formula sacrificed both actuarial equivalence and its *full* discretion. If the commission had intended to retain the discretion to unilaterally change the actuarial assumptions for the sake of implementing the plain meaning of the actuarial equivalency requirement, it could have done so without explicitly memorializing this roundabout way "actuarial equivalence" was to be achieved. Moreover, even if the retirement commission retained some degree of discretion under the amended portion of the ordinance's reference to a "blended" table, the *employer's* unequivocal application of the 100% female/0% male table for 24 years meant that the employers sacrificed adherence to the plain meaning of "actuarial equivalence," and that all parties to the CBAs were bound to the specific 100% female/0% male blend.

The retirement commission's amendment to the retirement ordinance makes the comparison to *Gogebic College Mich Ed Support Personnel Ass'n v Gogebic Community*

---

[21] The majority also fails to note that § 15 refers explicitly to "the 1971 group annuity mortality table projected to 1984 with ages set back 2 years." The newly proposed 60% female/40% male table would be based on "the 2000 RP Mortality Table projected for 15 years, with no set back on ages." The newly proposed table represents a change to the plain language of § 15.

*College*[22] unhelpful. In *Gogebic*, the Court of Appeals held that the employer had discretion to select the dental insurance carrier, because the contract only indicated what benefits were due employees, not what carrier would provide the benefits. The retirement ordinance in this case did not merely state that employees would be able to elect optional pension benefits, but actually set the means by which those benefits would be calculated and explicitly incorporated the actuarial assumptions to be used in calculating optional pension benefits.

The amendment to § 15 of the retirement ordinance reflects the retirement commission's adoption of the 100% female/0% male mortality table, and the parties' application of that table represents a "definite, certain, and intentional" action. Because the parties' commitment to this intentional formula lasted 24 years and survived a previous actuarial study without change, I would find that the charging parties have shown that the past practice was so widely acknowledged and mutually accepted as to create an amendment to the contract, and that the PERA mandates the parties return to the bargaining table.

Bridget M. McCormack
Michael F. Cavanagh

VIVIANO, J., took no part in the decision of this case because he was the Chief Judge of the 16th Judicial Circuit Court before his appointment to this Court.

---

[22] *Gogebic College Mich Ed Support Personnel Ass'n v Gogebic Community College*, 246 Mich App 342; 632 NW2d 517 (2001).