*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JANICE VANDERHULL,

Plaintiff-Appellee,

v

CITY OF DEARBORN EMPLOYEES
RETIREMENT SYSTEM BOARD OF
TRUSTEES,

Defendant-Appellant.

UNPUBLISHED
February 4, 2020

No. 346670
Wayne Circuit Court
LC No. 18-009836-AW

Before: BECKERING, P.J., and CAVANAGH and STEPHENS, JJ.

PER CURIAM.

This mandamus action arises out of a dispute over the eligibility of plaintiff, Janice Vanderhull, to receive an optional annuity as the widow of her late husband, James Vanderhull ("the decedent"), a former employee of the city of Dearborn. Defendant, City of Dearborn Employees Retirement System Board of Trustees, appeals as of right the trial court's order, in pertinent part, granting plaintiff partial summary disposition in the form of a writ of mandamus compelling defendant to begin paying the disputed annuity.

On appeal, defendant argues that the trial court erred by misinterpreting the city ordinance ("Chapter 22") that governs the eligibility of former city employees and their surviving spouses. Specifically, defendant argues that, under the meaning plainly expressed by the text of Chapter 22, although the 59-year-old decedent elected and was approved to receive the optional annuity before he died, he was not yet entitled to receive it on the date of his death—not having achieved the minimum retirement age of 60 years—and therefore, plaintiff is not entitled to collect an annuity as his surviving spouse. Although the trial court's reasoning was erroneous in certain respects, because it reached the correct outcome, we affirm.

## II. PERTINENT FACTS AND PROCEDURAL HISTORY

This case arises out of the decedent's election of an optional annuity (a "B-100 annuity"), in lieu of certain other deferred-retirement annuity options, for his service as a Dearborn employee from 1985 to 1997. The essential background facts are undisputed, with the parties disagreeing

-1-

only about a pure question of law. The parties agree that plaintiff's entitlement to collect annuity benefits as the decedent's surviving spouse is governed by the language of Chapter 22, which was originally "submitted as an amendment to the Charter of the City of Dearborn" in 1950, and has since been amended as a city ordinance. The parties disagree only about the proper interpretation and application of Chapter 22 in this case.

During the pertinent timeframe, Chapter 22 provided, in relevant part:

DEFINITIONS:

SECTION 22.2. The following words and phrases wherever used in this charter amendment, *unless a different meaning is plainly required by the context*, shall have the following meanings:

* * *

(c) "Retirement System" shall mean the retirement system established by this charter amendment.

* * *

(e) "Member" shall mean any person included in the membership of the retirement system.

* * *

(h) "Service" shall mean service performed as an officer or employee of the City.

* * *

(o) "Annuity" shall mean a monthly amount payable by the system throughout the life of a person or for a temporary period.

* * *

(q) "Retirant" means a former member *receiving* a System annuity, by reason of having been a member.

(r) "Voluntary Retirement Age" shall be the age at which a member (1) has 25 or more years of service credited to his service account on or after his attainment of age 55 years, or (2) has 10 or more years of service credited to his service account on or after his attainment of age 60 years, whichever occurs first.

* * *

(t) The masculine gender shall include the feminine gender, and words of the singular number in relation to persons shall include the plural number and vice versa.

(u) "Beneficiary" means any person who *is receiving* or who is designated by a member to receive a System benefit, except a retirant.

\* \* \*

MEMBERSHIP:

SECTION 22.11. (a) The following persons shall become members of the retirement system, except as provided in paragraph (b) of this section: . . . all persons who become officers or employees of the City on and after the effective date of the retirement system . . . .

\* \* \*

TERMINATION OF MEMBERSHIP:

SECTION 22.12. Except as otherwise provided in this chapter, should any member separate from the service of the City for reasons other than becoming a beneficiary, the person shall thereupon cease to be a member, and any prior service and membership service which may be credited to his service account at the date of his last separation from City service shall be forfeited.

\* \* \*

VOLUNTARY RETIREMENT:

SECTION 22.16. Any member who has attained his voluntary retirement age, as defined in section 22.2(r) of this chapter, may retire from City service upon his written application to the board setting forth at what time, not less than 30 days nor more than 90 days subsequent thereto, he desires to be retired.

\* \* \*

RETIREMENT ANNUITY:

SECTION 22.18. . . . A member who attained his voluntary retirement age and retires on or after July 1, 1975, shall receive a life annuity equal to 1/12th of the total provided by paragraphs (a) through (c) next below . . . .

\* \* \*

DEFERRED RETIREMENT:

SECTION 22.19. Should any member who has 25 or more years of service credited to his service account separate from City service prior to his attainment of his voluntary retirement age, for reasons other than becoming a beneficiary, he shall remain a member during the period of his absence from City service for the exclusive purpose only of receiving a service retirement annuity provided for in

section 22.18 of this chapter. The said service retirement annuity shall begin as of the first day of the calendar month next following the date his application for same is filed with the board *on or after his attainment of his voluntary retirement age. . . .*

(a) Should a member with ten (10) or more years of credited service cease to be a member July 1, 1978 or later, except by death or retirement, he shall be entitled to a deferred annuity provided for in this section; provided, that he does not withdraw his accumulated contributions from the annuity savings fund.

Such deferred annuity shall commence as of the first day of the calendar month next following *the later of*: his attainment of his voluntary retirement age; or the date of his written application therefor is received by the Board.

*He shall have the right to elect an option provided for in Section 22.20 at the time of filing such written application.*

(b) The former member's deferred annuity shall be a life annuity provided for in Section 22.18 at the time of termination of City employment.

(c) If a former member entitled to a deferred allowance dies before he is eligible to collect a deferred allowance, his then surviving spouse shall receive an allowance computed in the same manner in all respects as if the former member had lived until he was eligible to collect a deferred allowance unless otherwise provided by an Eligible Domestics Relations Order on file with the pension administrator. The allowance will not be payable to the surviving spouse until the former member would have otherwise been eligible to collect an allowance under Subsection (1) of this Section 22.19. *This benefit is available to members deferring retirement and leaving the employment of the City after January 1, 2002. . . .*

OPTIONAL ANNUITIES:

SECTION 22.20. (1) Under such rules and regulations and limitations as the board may adopt, *before the date the first payment of his annuity becomes due but not thereafter*, a person *about to become a retirant* may elect to receive an optional form of an annuity *in lieu of the annuity otherwise payable to him*. The value of each such optional form of annuity shall be the actuarial equivalent of the value of the annuity otherwise payable to him; provided, however, that for any member retiring on or after July 1, 1977 and having attained his voluntary retirement age as defined in Section 22.2(r), the value of any reduced optional annuity shall be the actuarial equivalent of the annuity otherwise payable to him, based upon his age and his designated beneficiary's age at the time he attained his voluntary retirement age. The optional forms of annuity shall be the forms following:

(a) Option B-100. Upon the death of *a retirant who elected Option B-100,* 100% of his reduced annuity *to which he would have been entitled had he lived* shall be paid to his surviving beneficiary for the lifetime of such surviving

beneficiary, who shall be one person with an insurable interest in the retirant's life who was nominated by the retirant by written designation duly executed and filed with the board before his retirement.

* * *

(2) If a retirant elected Option B-100 . . . and if the person nominated as beneficiary thereunder predeceases the retirant, *such dual lifetime optional plan* shall be canceled . . . . [Emphasis added.]

Defendant concedes that when the decedent separated from his employment with Dearborn in July 1997, he had accrued "11.8 years of service" credit. In August 2017, the decedent submitted an application for a deferred-retirement annuity under Chapter 22, selecting option B-100 and nominating plaintiff as his sole beneficiary. Defendant approved his application at its regular board meeting on September 21, 2017. On October 9, 2017, the decedent died, about one month short of his 60th birthday. In other words, he died about one month before reaching the "voluntary retirement age" for a person with his years of service credit, as set forth in § 22.2(r) of Chapter 22.

In November 2017, plaintiff's attorney sent correspondence to defendant requesting payment of the B-100 annuity to plaintiff as the decedent's surviving widow and named beneficiary. Defendant denied plaintiff's request. In support, defendant cited the final sentence in § 22.19(c) ("This benefit is available to members deferring retirement and leaving the employment of the City after January 1, 2002."). Defendant indicated that because the decedent had "deferred his retirement prior to January 1, 2002," and died before reaching his voluntary retirement age, he was not entitled to receive a deferred annuity at the time of his death; therefore, plaintiff was not entitled to collect under the B-100 annuity as the decedent's surviving beneficiary. In February 2018, plaintiff's attorney again sent correspondence requesting payment of the disputed annuity benefits, and defendant again denied that request.

Plaintiff instituted this action in August 2018, filing a complaint seeking a writ of mandamus compelling defendant to accept her request for payment of the "surviving spousal allowance" provided for under the B-100 annuity. Relevant here, plaintiff alleged:

In the context of this case, the controlling language of the Pension Ordinance is Section 22.20 and the Option B-100 election provisions of that section as opposed to Section 22.2(r). A careful reading of Section 22.20 reflects the fact that the term Voluntary Retirement Age is not used in that section as condition precedent to collecting a surviving spousal allowance. The term is used in the context of determining the amount of the pension benefit. The Option B-100 language does not condition [plaintiff's] right to a surviving spousal allowance upon [the decedent] attaining age 60 or collecting a retirement allowance at the time of his death.

After answering plaintiff's complaint, defendant moved for summary disposition under MCR 2.116(C)(8) (failure to state a claim for relief) and (C)(10) (no genuine issue of material fact). In support, defendant argued that it was entitled to summary disposition because a writ of

mandamus was inappropriate given that plaintiff had an adequate legal remedy, i.e., a claim seeking damages or injunctive relief against defendant for failure to pay the disputed B-100 annuity, and because the approval of her annuity request was not a ministerial task. Defendant also argued that, in any event, plaintiff's request was barred (1) under § 22.19(c) because the decedent both deferred his retirement and left his employment with Dearborn before January 1, 2002, (2) under § 22.20(1) because the decedent did not qualify as a "retirant" at the time of his death, having died before reaching his voluntary age and not having ever "received" an annuity payment under the retirement system, and (3) again under § 22.20(1) because that section states that the value of an optional annuity such as the B-100 annuity "shall be the actuarial equivalent of the value of the annuity otherwise payable to him; *provided, however, that for any member retiring on or after July 1, 1977 and having attained his voluntary retirement age as defined in Section 22.2(r), the value of any reduced optional annuity shall be the actuarial equivalent of the annuity otherwise payable to him, based upon his age and his designated beneficiary's age at the time he attained his voluntary retirement age.*" (Emphasis added.)

The trial court granted defendant partial summary disposition to the extent that plaintiff's complaint could be construed as requesting "under Section 22.19(c) of . . . Chapter 22," denied defendant's motion for partial summary disposition with regard to plaintiff's request for B-100 survivorship benefits pursuant to § 22.20(1), and granted plaintiff her requested writ of mandamus compelling defendant "to approve payment to Plaintiff of the Option B-100 reduced annuity as a surviving named beneficiary." The trial court reasoned that (1) § 22.20(1) "stands on its own and is not altered by Section 22.19[(c)]"; (2) in the context of § 22.20(1)(a) and its language concerning the annuity to which the retirant "would have been entitled had he lived," the term "retirant" had to be afforded a different meaning than the definition provided by § 22.2(q); (3) as used in § 22.20(1), the term "retirant" included a person who was "about to become a retirant had he lived"; and (4) under that construction, there was no genuine issue of material fact that the decedent qualified as a "retirant" for purposes of § 22.20(1) at the time of his death, which entitled plaintiff to collect option B-100 survivorship benefits.

## II. ANALYSIS

On appeal, defendant argues that the trial court's construction of Chapter 22 was erroneous, raising the same essential arguments that it raised in the trial court. While we agree that the trial court's reasoning was erroneous, reversal is unwarranted because the trial court reached the correct result. See *Lewis v Farmers Ins Exch*, 315 Mich App 202, 216; 888 NW2d 916 (2016).

"[B]ecause mandamus is a discretionary writ, we review for an abuse of discretion a trial court's decision regarding whether to grant mandamus relief." *Berry v Garrett*, 316 Mich App 37, 41; 890 NW2d 882 (2016) (quotation marks and citation omitted). However, "[t]o the extent that a request for a writ of mandamus involves questions of law, we review them de novo." *Citizens Protecting Mich's Constitution v Secretary of State*, 503 Mich 42, 59; 921 NW2d 247 (2018). A trial court's ruling regarding a motion for summary disposition is also reviewed de novo. *Heaton v Benton Constr Co*, 286 Mich App 528, 531; 780 NW2d 618 (2009).

"The rules governing the construction of statutes apply with equal force to the interpretation of municipal ordinances." *Gora v City of Ferndale*, 456 Mich 704, 711; 576 NW2d

141 (1998). As explained in *Sun Valley Foods Co v Ward*, 460 Mich 230, 236-237; 596 NW2d 119 (1999):

> The rules of statutory construction are well established. The foremost rule, and our primary task in construing a statute, is to discern and give effect to the intent of the Legislature. This task begins by examining the language of the statute itself. The words of a statute provide the most reliable evidence of its intent[.] If the language of the statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written. No further judicial construction is required or permitted. Only where the statutory language is ambiguous may a court properly go beyond the words of the statute to ascertain legislative intent.
>
> In interpreting the statute at issue, we consider both the plain meaning of the critical word or phrase as well as its placement and purpose in the statutory scheme. As far as possible, effect should be given to every phrase, clause, and word in the statute. [Quotation marks and citations omitted.]

"A provision of a statute is ambiguous only if it irreconcilably conflicts with another provision or is equally susceptible to more than a single meaning." *Bedford Pub Sch v Bedford Ed Ass'n MEA/NEA*, 305 Mich App 558, 565; 853 NW2d 452 (2014).

To properly construe the phrase "to which he would have been entitled had he lived" in § 22.20(1)(a), one must recognize the technical import of such language in the context of annuities in general. See MCL 8.3a ("All words and phrases shall be construed and understood according to the common and approved usage of the language; but technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning."); *Macomb Co v AFSCME Council 25*, 494 Mich 65, 84 & n 55; 833 NW2d 225 (2013) (applying MCL 8.3a when construing an undefined "term of art" in a municipal ordinance). As recognized in § 22.19(b), the annuities provided for under §§ 22.18 and 22.19 are in the form of a "life annuity[.]" Traditionally, a "life annuity" is a form of periodic payment that is "payable only during the annuitant's lifetime, even if the annuitant dies prematurely." *Black's Law Dictionary* (11th ed). Therefore, one inherent risk for married couples considering a "straight" life annuity as a stream of retirement income is that, if the annuitant spouse dies first, then the annuity terminates immediately, providing no further income for the surviving spouse or refund of annuity principal to the annuitant's estate. See *id*. (noting that "straight life annuity" is synonymous with "nonrefund annuity"). One way to hedge such risk is to choose a type of modified life annuity—sometimes referred to as a "survivorship annuity"—which provides "continued payments to a survivor . . . after the original annuitant dies." *Id*. Of course, as is true of nearly all investment options, a risk-reward trade-off exists. Because survivorship annuities are, generally speaking, designed to be safer (i.e., to last longer on average), the actuarially determined annuity payments tend to be significantly less than the payments offered by the riskier straight life annuity. See, e.g., *Clarkson v Judges Retirement Sys*, 173 Mich App 1, 4; 433 NW2d 368 (1988).

In this case, the "optional annuities" listed in § 22.20(1), including the B-100 annuity at issue in this case, are all various forms of survivorship annuities. The listed options differ primarily

in the proportional allocation of the "reduced" annuity that each pays to a surviving spouse, with the payment amounts generally determined by an "actuarial" assessment "based upon [the annuitant's] age and his designated beneficiary's age[.]" § 22.20(1). Under the B-100 option, for example, following the annuitant's death, the surviving spouse receives a life annuity consisting of 100% of the "reduced annuity to which [the annuitant] would have been entitled had he lived[.]" § 22.20(1)(a). Contrastingly, under the B-75 option, following the annuitant's death, the surviving spouse receives a life annuity consisting of 75% of the "reduced annuity to which [the annuitant] would have been entitled had he lived[.]" § 22.20(1)(b).

In other words, the surviving spouse's payments under a B-100 annuity are the same as the "reduced annuity" that the annuitant would have received "had he lived[.]" In our view, although the "had he lived" language that appears in each of the listed annuity options under § 22.20(1) *tends* to support a construction under which a surviving spouse would be entitled to his or her survivorship payments even if the annuitant died before becoming eligible for payments, that conclusion does not *necessarily* follow from such language alone, as the trial court seemingly concluded. Viewed in context, the "had he lived" language is merely a way of describing how the surviving spouse's payments should be determined (i.e., by reference to the "reduced annuity" that the annuitant would have received "had he lived" to do so), not a guarantee that the surviving spouse *will* be entitled to collect survivorship benefits. Put differently, the "had he lived" language—by itself—does not foreclose a contingency under which, because the annuitant was not entitled to collect any annuity, the surviving spouse is likewise entitled to none.

For similar reasons, we are unpersuaded by defendant's argument concerning the proper interpretation of the following language from § 22.20(1):

> . . . The value of each such optional form of annuity shall be the actuarial equivalent of the value of the annuity otherwise payable to him; *provided, however, that for any member retiring on or after July 1, 1977 and having attained his voluntary retirement age as defined in Section 22.2(r), the value of any reduced optional annuity shall be the actuarial equivalent of the annuity otherwise payable to him, based upon his age and his designated beneficiary's age at the time he attained his voluntary retirement age*. [Emphasis added.]

Defendant argues that because it is undisputed that the decedent never attained his voluntary retirement age, the above-emphasized language plainly precludes plaintiff from entitlement to B-100 survivorship benefits under § 22.01. Again, however, the language in question merely describes the mechanism by which the amount of a surviving spouse's payments will be determined; it does not set forth a condition precedent to entitlement to such benefits. Also, the emphasized portion of § 22.20(1) does not apply to the decedent at all, given the parties' agreement that he was not a "member" when he elected option B-100, let alone one who had attained his voluntary retirement age. Indeed, defendant's strained interpretation ignores the language immediately preceding the above-emphasized portion of § 22.20(1): "[t]he value of each such optional form of annuity shall be the actuarial equivalent of the value of the annuity otherwise payable to him[.]" Viewed in context, the general rule seems to be that the value of the optional annuity "shall be the actuarial equivalent of the value of the annuity otherwise payable to" the annuitant, with the language thereafter providing an exception that applies to "any member retiring

on or after July 1, 1977 and having attained his voluntary retirement age as defined in Section 22.2(r)[.]"

In our view, the instant question of interpretation hinges on whether the decedent qualified as a "retirant" at the time of his death for purposes of § 22.20(1). That question, in turn, hinges on the proper interpretation of the term "receiving" in the definition of "retirant" at § 22.2(q). After carefully examining the language of the pertinent provisions, we disagree with the trial court's conclusion that, for purposes of § 22.20(1), it is necessary to afford the term "retirant" a meaning that differs from the one set forth by the § 22.2(q).

"[S]tatutory language must be read within its grammatical context unless something else was clearly intended[.]" *In re AGD*, 327 Mich App 332, 344-345; 933 NW2d 751 (2019) (quotation marks and citation omitted). In § 22.2(q), the word "receiving" is, like many words ending in "–ing," a participle, i.e., "a word having the characteristics of both verb and adjective[.]" *Merriam-Webster's Collegiate Dictionary* (11th ed), p 903. Whether a participle is used in an adjectival fashion or falls into one of numerous grammatical categories of "tense" depends on the context and how the participle is modified by the words around it. See, e.g., *City of Coldwater v Consumers Energy Co*, 500 Mich 158, 176; 895 NW2d 154 (2017) (construing the word "receiving" as a progressive present participle because it was modified by the adverb "already"). Based on such contextual considerations—and temporarily ignoring distinctions between perfect, imperfect, contingent, and continuous (or "progressive") tenses—the tense of the participle in question may be past (e.g., "was receiving"), present (e.g., "is receiving"), or future (e.g., "will be receiving").

In both places that it appears in § 22.2(q), the word "member" is modified in ways that indicate that it relates to the past (i.e., "*former* member" and "*having been* a member"). (Emphasis added.) But the participle in question here—"receiving"—is not modified directly in such a manner that it is recognizable as a past, present, or future participle. Contrastingly, the definition of "beneficiary" at § 22.2(u) includes the phrase "any person who *is receiving* . . . a System benefit," with the present-tense verb "is" modifying "receiving" to indicate that "receiving" is a present participle. This Court will "presume that [a] phraseological distinction reflects a legislative intent to treat . . . concepts differently." *Lickfeldt v Dep't of Corrections*, 247 Mich App 299, 306; 636 NW2d 272 (2001). In other words, we presume that if those enacting § 22.2(q) had intended the word "receiving" to be a participle with a particular temporal tense, then they would have used language indicating as much. Because they did not, we interpret the word "receiving" as an adjectival present participle, which modifies the immediately preceding phrase: "a former member[.]" See *In re AGD*, 327 Mich App at 345 (discussing the "last-antecedent rule," which "is a general rule of grammar and of statutory construction that a modifying word or clause is confined solely to the last antecedent, unless a contrary intention appears") (quotation marks and citation omitted); *People v Manuel*, 319 Mich App 291, 302; 901 NW2d 118 (2017) (construing the term "drying" as an adjectival present participle). Such participles are "used in verb phrases to signal the progressive aspect," which "shows 'that an action or state—past, present, or future— *was, is, or will be unfinished at the time referred to*.' " *Id.* at 302 (emphasis added; citations omitted).

In light of those principles, the term "retirant" cannot be interpreted as narrowly as defendant suggests. The text of § 22.2(q) does not specify that a retirant must be a former member

who *has received* a System annuity, nor does it indicate the he or she must be a former member who is *already receiving* such an annuity. Rather, a retirant is simply "a former member receiving a System annuity . . . ." § 22.2(q). One can be involved in the act of "receiving" something that is not yet in one's possession. By way of analogy, a football player who is running downfield to catch an airborne forward pass is, although not yet in *possession* of the football, nevertheless in the process of "receiving" it. More aptly, perhaps, a few days after a real-estate closing, a mortgagee that loaned funds at that closing, but which has not yet received the borrower's first periodic mortgage payment (because it is not due for one month after closing), can nevertheless be considered to be in the act of "receiving" the scheduled payments. Similarly, in this case, after defendant approved the decedent's application for a B-100 annuity, the decedent qualified as a "retirant" under § 22.2(q). Although he had not yet received any annuity payments, he had been approved to begin receiving them as a matter of course when he reached his minimum retirement age. The fact that the progressive process of receiving the payments was "unfinished at the time referred to" is consistent with the meaning expressed by the present progressive participle "receiving" as it is used in § 22.2(q). See *Manuel*, 319 Mich App at 302 (quotation marks and citations omitted).

Grammar aside, this construction also acts to harmonize § 22.20(1) with the subsection immediately following it, which refers to "Option B-100" as a "dual lifetime optional plan[.]" § 22.20(2). In the context of annuities, the descriptive phrase "dual lifetime" plainly suggests that the given annuity's duration will span the lives of two people, not one. A construction of § 22.20(1)(a) that, under certain circumstances, would limit the duration of an approved B-100 annuity based on the death of the annuitant *only*, disregarding the lifespan of the surviving beneficiary, would spawn discord between § 22.20(1) and § 22.20(2). Such an inharmonious construction must be avoided. See *Allstate Ins Co v State Farm Mut Auto Ins Co*, 321 Mich App 543, 559; 909 NW2d 495 (2017) ("a word or phrase in a statute must not be read in a vacuum; it must be harmonized with the whole statute").

Moreover, we are unswayed by defendant's argument that the final sentence in § 22.19(c) precludes plaintiff from collecting under option B-100, which the decedent selected pursuant to § 22.20(1)(a). The sentence relied on by defendant provides, "*This benefit* is available to members deferring retirement and leaving the employment of the City after January 1, 2002." § 22.19(c) (emphasis added). In the context of that full paragraph, it is clear that the phrase "[t]his benefit" refers to the eligibility of a surviving spouse, under certain circumstances, to collect "an allowance under . . . Section 22.19," not § 22.20. Indeed, § 22.20(1) explicitly states that an optional annuity elected under that section—such as a B-100 annuity—will be received "*in lieu of* the annuity *otherwise* payable to [the annuitant]" under Chapter 22. (Emphasis added.) Hence, the final sentence of § 22.19(c) is immaterial for purposes of determining plaintiff's eligibility for the disputed survivorship benefits under § 22.20(1)(a).

## III. CONCLUSION

Construing Chapter 22 as a harmonious whole and in the proper grammatical context, plaintiff is entitled to collect survivorship benefits under the B-100 annuity elected by the decedent. For purposes of § 22.20(1)(a), he qualified as a "retirant" who had duly elected option B-100 because, after defendant approved his application for that annuity, the decedent was a former member engaged in the progressive process of "receiving" his annuity payments. Accordingly,

after he died, plaintiff was entitled to collect "100% of his reduced annuity to which he would have been entitled had he lived[.]" § 22.20(1)(a).

Affirmed.

/s/ Jane M. Beckering
/s/ Mark J. Cavanagh
/s/ Cynthia Diane Stephens