*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CITY OF DETROIT,

UNPUBLISHED
February 1, 2022

Respondent-Appellant,

v

No. 355412
Michigan Employment Relations
   Commission (MERC)

DETROIT FIREFIGHTERS ASSOCIATION
LOCAL 344,

LC No. 19-C-0479-CE

Charging Party-Appellee.

Before: GADOLA, P.J., and MARKEY and MURRAY, JJ.

PER CURIAM.

Respondent, the city of Detroit (the City), appeals by right a decision and order of the Michigan Employment Relations Commission (MERC), which adopted a recommendation by an administrative law judge (ALJ) finding that the Detroit Fire Department (the Department) engaged in an unfair labor practice (ULP) against members of the charging party, the Detroit Firefighters Association Local 344 (the Union), under the public employment relations act (PERA), MCL 423.201 *et seq*. This case arises out of the Department's purchase and use of new monitor-defibrillators that generate data that was utilized to discipline and discharge two Department employees for neglect of duty when providing emergency medical treatment to a patient. The issue presented in this case concerns whether such use of the new monitor-defibrillators is subject to mandatory collective bargaining. We reverse and remand for entry of an order in favor of the City.

## I. PERA

To give context to our discussion of the facts, we begin with an overview of PERA. In *Wayne Co v AFSCME Local 3317*, 325 Mich App 614, 618-620; 928 NW2d 709 (2018), this Court discussed PERA, observing as follows:

"The legislature may enact laws providing for the resolution of disputes concerning public employees, except those in the state classified civil service." Const 1963, art 4, § 48. Our Legislature enacted PERA, and the supremacy of the

-1-

provisions of PERA is predicated on the Constitution and the apparent legislative intent that PERA be the governing law for public employee labor relations. . . . PERA drastically altered labor relations in Michigan with respect to public employees, reflecting legislative goals to protect public employees against ULPs and to provide remedial access to a state-level administrative agency with specialized expertise in ULPs.

Section 10 of PERA, MCL 423.210, sets forth a list of prohibitions and conditions related to public employment, and violations of the provisions of section 10 shall be deemed to be unfair labor practices remediable by MERC, MCL 423.216. . . . MCL 423.216 vests MERC with exclusive jurisdiction over unfair labor practices. [Quotation marks, citations, ellipses, brackets, and emphasis omitted.]

In this case, the Union contended that the City violated the duty to bargain under MCL 423.210(1)(a), (b), and (e). A public employer is not permitted to "[i]nterfere with, restrain, or coerce public employees in the exercise of their rights . . . ." MCL 423.210(1)(a). Additionally, a public employer shall not "[i]nitiate, create, dominate, contribute to, or interfere with the formation or administration of any labor organization." MCL 423.210(1)(b). Finally, a public employer cannot "[r]efuse to bargain collectively with the representatives of its public employees . . . ." MCL 423.210(1)(e).

"PERA governs the relationship between public employees and governmental agencies." *Macomb Co v AFSCME Council 25 Locals 411 & 893*, 494 Mich 65, 77-78; 833 NW2d 225 (2013). "Representatives designated or selected for purposes of collective bargaining by the majority of the public employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the public employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment . . . ." MCL 423.211. Section 15(1) of PERA provides:

A public employer shall bargain collectively with the representatives of its employees as described in section 11 and may make and enter into collective bargaining agreements with those representatives. Except as otherwise provided in this section, for the purposes of this section, to bargain collectively is to perform the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith *with respect to wages, hours, and other terms and conditions of employment*, or to negotiate an agreement, or any question arising under the agreement, and to execute a written contract, ordinance, or resolution incorporating any agreement reached if requested by either party, but this obligation does not compel either party to agree to a proposal or make a concession. [MCL 423.215(1) (emphasis added).]

For purposes of MCL 423.215(1), "[a]fter the parties have met in good faith and bargained over the mandatory subjects placed upon the bargaining table, they have satisfied their statutory duty." *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 55; 214 NW2d 803 (1974). When a ULP concerns an alleged failure to bargain, MERC must review the terms of the relevant CBA to ascertain whether a party has indeed breached the statutory duty to bargain. *Port Huron Ed Ass'n,*

*MEA/NEA v Port Huron Area Sch Dist*, 452 Mich 309, 321; 550 NW2d 228 (1996). "In reviewing an agreement for any PERA violation, the MERC's initial charge is to determine whether the agreement 'covers' the dispute[,]" and "[i]f the term or condition in dispute is 'covered' by the agreement, the details and enforceability of the provision are left to arbitration." *Id.*

"The determination of what constitutes a mandatory subject of bargaining under the PERA is to be decided case by case." *Southfield Police Officers Ass'n v Southfield*, 433 Mich 168, 178; 445 NW2d 98 (1989). "It has long been established that any matter that has a *significant* impact on wages, hours, or other terms and conditions of employment is subject to mandatory bargaining." *Oak Park Pub Safety Officers Ass'n v Oak Park*, 277 Mich App 317, 325; 745 NW2d 527 (2007). Rules regarding "disciplinary policies constitute a mandatory subject of bargaining." *Amalgamated Transit Union, Local 1564, AFL-CIO v Southeastern Mich Transp Auth*, 437 Mich 441, 452 n 7; 473 NW2d 249 (1991), citing *Pontiac Police Officers Ass'n v Pontiac*, 397 Mich 674, 681; 246 NW2d 831 (1976).

In this case, the Union argued that the City unilaterally changed the terms and conditions of employment for its members in violation of PERA. Under PERA, an employer commits a ULP if, absent bargaining, the employer unilaterally alters or modifies a term or condition of employment. *Org of Sch Administrators & Supervisors, AFSA, AFL-CIO v Detroit Bd of Ed*, 229 Mich App 54, 65; 580 NW2d 905 (1998); see also *United Auto Workers, Local 6888 v Central Mich Univ*, 217 Mich App 136, 138; 550 NW2d 835 (1996) ("Absent an impasse, neither party may take unilateral action with respect to a mandatory subject of bargaining," and doing so constitutes a ULP under MCL 423.210.). "A condition of employment is subject to bargaining, but issues of policy are exclusively reserved to government discretion or management prerogative and cannot be made mandatory subjects of bargaining." *Oak Park*, 277 Mich App at 326. The party that asserts a claim or violation under PERA has the burden to establish a ULP. *Org of Sch Administrators*, 229 Mich App at 64-65.

In this case, issues arose regarding whether the Union was properly notified about the potential disciplinary use of the new monitor-defibrillators and whether the Union waived any claim of a PERA violation. An employer must "provide the charging party with notice and an opportunity to bargain before making changes in the existing terms or conditions of employment[.]" *St. Clair Intermediate Sch Dist v Intermediate Ed Ass'n/Mich Ed Ass'n*, 218 Mich App 734, 739; 555 NW2d 267 (1996). The right to bargain over changes is waived if there is sufficient evidence of a clear, explicit, and unmistakable waiver of the right, not mere error or lack of knowledge. *Id.* at 740. Generally, a union must make a demand to bargain in order to trigger the employer's duty to bargain, but a demand is unnecessary when it would have been futile under the circumstances presented. *Id.*

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case arises from the Department's purchase of Zoll X Series Monitor-Defibrillators (Zoll Monitors) for the stated purpose of protecting the health and safety of citizens and firefighters, and then using the Zoll Monitors to establish culpability in a disciplinary proceeding against two employees. There is no dispute that such use of the Zoll Monitors was not the specific subject of any collective bargaining agreement.

At the underlying administrative hearing, Department Lieutenant Glenn Goodson indicated that the Department's ambulances had been equipped with Lifepak 15 Monitor-Defibrillators (Lifepak Monitors) before the purchase and use of the Zoll Monitors. The Lifepak Monitors were similar to the Zoll Monitors but did not have "active feedback," which, according to Lieutenant Goodson, was a "new way of seeing real time what's going on with a cardiac arrest as far as what the monitor is witnessing regarding the depth and release velocity for the compression and how fast they're coming back off of the chest[,]" i.e., rates of compression. While a Lifepak Monitor could be configured to gather the same data as the Zoll Monitor, it required an additional separate device that the Department never purchased or used.

Further, the data collected from a Zoll Monitor could be reviewed in real time and wirelessly, whereas the data collected from a Lifepak Monitor could only be reviewed after downloading the data from the physical monitor. Accordingly, the easy accessibility of data from a Zoll Monitor allowed the Department to more routinely look at emergency runs for quality assurance, including nearly all cardiac arrest cases, as compared to the Lifepak Monitors, where data was only reviewed when a full investigation was opened. There was evidence that both the Zoll Monitor and the Lifepak Monitor can tell whether cardiopulmonary resuscitation (CPR) was performed, and both monitors generate electrocardiogram (EKG or ECG) data. Lieutenant Goodson opined that the Zoll Monitor was more sophisticated than the Lifepak Monitor, with the ability to provide better patient care and qualitative CPR data. The Zoll Monitor provides the user with prompts with respect to performing defibrillation and CPR.

In 2013, the City and the Union negotiated a collective-bargaining agreement (CBA), which was effective from 2013 to 2020. In 2018, the City purchased 30 Zoll Monitors for the Department using grant money. In the grant application, the City indicated that the purpose for seeking the Zoll Monitors was to provide for citizen and firefighter safety. The City did not specifically mention, nor was there a discussion about, using the Zoll Monitors for disciplinary purposes. At no point was the Union involved in the purchase of the Zoll Monitors. After purchasing the Zoll Monitors, Lieutenant Goodson conducted employee training with respect to the use of the new monitors. During the training, employees were told that the Zoll Monitors were designed to provide better patient outcomes. There was evidence that Lieutenant Goodson assured the employees that the data from the Zoll Monitors would be used for training purposes only, not disciplinary matters, unless there were an egregious or neglectful situation. Lloyd Watley, an employee and Union representative, claimed that Lieutenant Goodson told employees that data from the Zoll Monitors would not be used in disciplinary proceedings, but only for quality assurance and to improve overall CPR outcomes. Because the Union's understanding was that the Zoll Monitors would not be used in disciplinary proceedings, the Union did not object to or file a grievance over the use of the Zoll Monitors.

Department Assistant Superintendent of Emergency Medical Services Joseph C. Barney, III, testified that a quality assurance/quality improvement (QA/QI) program had been in operation within the Department for at least 25 years. And the QA/QI program used EKG data collected from the previously-utilized Lifepak Monitors. Assistant Superintendent Barney noted that the Union had never objected to the use of EKG data from the Lifepak Monitors in the QA/QI program. Assistant Superintendent Barney further recalled three previous cases where EKG data from a monitor was used to discipline Department employees after a citizen or hospital complaint. He claimed that a policy in the "standard operating procedure" allowed the Department to use anything

for disciplinary purposes if the conduct at issue was egregious. Assistant Superintendent Barney indicated that employees were told that Zoll Monitor data would be examined in the process of operating the QA/QI program and that if the Union took issue with the policy, it should have objected or lodged a grievance.

In 2019, a citizen complaint was filed against two Department employees, a paramedic and an emergency medical technician, alleging that the employees "failed to provide proper care to [a] patient and that he subsequently suffered a cardiac arrest and died." Department Superintendent of Emergency Medical Services Sean Larkins conducted and led an investigation. It was determined that the employees had committed neglect of duty for which they were discharged. As part of the investigation, data from a Zoll Monitor was collected from the emergency run and analyzed by, among others, Lieutenant Goodson. Despite never previously reviewing Zoll Monitor data for disciplinary purposes, Lieutenant Goodson stated that he objectively examined the data and determined that it was highly unlikely that the two embattled employees had followed protocols of the American Heart Association (AHA).[1] Lieutenant Goodson further observed that he would not have been able to assess whether the employees had abided by the AHA protocols using data from a Lifepak Monitor. Department Captain Robert A. Olkowski also prepared an investigation report, concluding as follows:

> Based upon the three witnesses recounting the same series of events and lack of action on the part of the crew, the inconsistencies on the part of the EMS crew as detailed above, lack of proper and complete documentation and the analysis of the data showing CPR NOT being performed[,] the conclusion drawn is that this complaint is substantiated. [Emphasis in original.]

The ultimate decisionmaker, Superintendent Larkins, stated that he only reviewed the Zoll Monitor data to determine or detect when it was powered on, heart rhythm, compressions, and, using the EKG information, whether CPR had been conducted, all of which he could have obtained from a Lifepak Monitor. As we will detail later in this opinion, Superintendent Larkins testified that the two employees were discharged for failing to perform any CPR, not for performing CPR inadequately or improperly. Superintendent Larkins asserted that his opinion was mostly formed on the basis of his experience with and knowledge of CPR and his review of the EKG data.

In March 2019, the Union lodged a ULP charge against the City, asserting that the data from the Zoll Monitor was used for disciplinary purposes, which was improper because such use

---

[1] In Lieutenant Goodson's investigation report, he wrote:

> The CPR data, report card and complete playback are not consistent with a crew performing CPR. No AHA guidelines were followed and the crew failed to follow any of the prompts from the Zoll X Series. The ECG data does not reflect compressions and more closely resembles the puck bouncing with road noise. The feedback on the monitor was not utilized, as there was no improvement in the CPR over time and there were no consistent rates, depth, or release velocity obtained throughout the duration of the recorded CPR time.

was subject to mandatory collective bargaining that had not occurred, thereby resulting in an impermissible unilateral alteration of the CBA. After the administrative hearing, the Union filed a posthearing brief, arguing that the Department's investigative and disciplinary use of the data from the Zoll Monitor, which was more advanced than the Lifepak Monitors, constituted a unilateral and unlawful change to the CBA. In response, the City maintained that the Department's discharge of the employees was grounded on numerous patient-care violations, relying on data that would have been available using either a Zoll Monitor or a Lifepak Monitor.

The ALJ concluded that the Department's use of the Zoll Monitor data in disciplining and discharging the employees constituted a ULP in that it unilaterally altered the terms and conditions of employment set forth in the CBA. Specifically, the ALJ determined that while the City "has the unilateral right to select and purchase new equipment for the Department [and] . . . establish procedures and protocols for its EMS technicians to follow in treating patients[,]" the City had a duty to bargain with the Union regarding the use of Zoll Monitor data as an investigatory or disciplinary tool. The ALJ reached that conclusion because "the Zoll [M]onitor provide[d] the Department with information about the CPR performed by its technicians, information to which the Department did not previously have access, and which is relevant to employees' work performance[.]" The ALJ explained:

> [B]ased on the investigatory report, . . . [the City] relied in part on the EKG data from the Zoll [M]onitor to conclude that [the employees] had not performed CPR on the patient. However, I also find, based again on the report, that it also looked at data from the Zoll [M]onitor about the rate, depth and release velocity of the compressions to reach this conclusion. I conclude that under the circumstances [the City]'s use of this new data from the Zoll [M]onitor to support its decision to discipline [the two employees] constituted an unlawful unilateral change in terms and conditions of employment.

The ALJ opined that the Union had not waived its right to bargain by failing to make a timely demand because Department statements—that the data would be reviewed for QA/QI purposes only—could have reasonably been interpreted as an assurance that the data would not be used for disciplinary purposes and, therefore, there was no need to demand to bargain. Although the City may have relied on the EKG data from the Zoll Monitor in the underlying disciplinary process, the ALJ, once again, determined that the inclusion and availability of new data in the process, including rate, depth, and release velocity of compressions, amounted to an unlawful unilateral change in the terms of employment. As a result, the ALJ recommended that the City be ordered to bargain with the Union with respect to the use of Zoll Monitor data as an investigative and disciplinary tool and to cease and desist using the data for disciplinary purposes until completion of the bargaining obligation.

The City filed exceptions to the ALJ's recommendation, arguing that the ALJ erred by concluding that the Zoll Monitor constituted an investigatory tool that had to be the subject of collective bargaining between the City and the Union. The City contended that the Zoll Monitors were used to enhance patient care, not to examine employee misconduct, and that the CBA gave full authority to the City to regulate procedures used by the Department in providing patient care. In response, the Union maintained that the ALJ correctly found that the City had a duty to bargain

regarding the use of data from Zoll Monitors in disciplinary proceedings, which bargaining would not result in inhibiting patient care and was not waived by the Union.

A MERC majority—two commissioners—adopted the ALJ's recommended decision and order, ruling that employee discipline is a mandatory subject of collective bargaining. Specifically, MERC determined that the CBA contained no provision suggesting that "the parties bargained over the [Department's] use of the new Zoll [Monitor] data as a tool to investigate employee conduct for potential disciplinary purposes[,]" which "unquestionably altered the character and type of evidence on which an employee's job security might depend." Moreover, MERC found that the Department's past practice did not support the City's contention that the CBA covered the use of Zoll Monitor data where the Department acknowledged that it infrequently reviewed Lifepak Monitor data and only relied on data in a couple of earlier cases for disciplinary purposes. Furthermore, MERC concluded that the Union had not waived its right to bargain, stating that "employees were told by the [Department] that the Zoll [Monitor] data would not be used for disciplinary investigations." And, consequently, "the only notice either the [Union] or employees were ever given prior to the use of the data in an disciplinary investigation[] was notice obviating any need to demand bargaining." As a result, MERC determined that the City "violated its duty to bargain by failing to provide the [Union] with prior notification and an opportunity to bargain before utilizing the Zoll [Monitor] data in a disciplinary investigation."

A dissenting opinion was issued by a MERC commissioner who opined that the CBA "covered the matter in dispute and there was no duty to engage in further bargaining." According to the dissent, regardless of the CBA, the City's "decision to purchase and install the Zoll Monitors was a matter of managerial prerogative and not a mandatory subject of bargaining." The dissent further reasoned that there was no violation of PERA because the Union failed to demand bargaining, even after engaging in the instant proceedings.

III.  ANALYSIS

A.  STANDARDS OF REVIEW

The Michigan Supreme Court in *AFSCME Council 25 Locals*, 494 Mich at 77, recited the standards of review governing our examination of a decision by MERC:

> In a case on appeal from the MERC, the MERC's factual findings are conclusive if supported by competent, material, and substantial evidence on the whole record. Legal questions, which include questions of statutory interpretation and questions of contract interpretation, are reviewed de novo. As a result, an administrative agency's legal rulings are set aside if they are in violation of the

constitution or a statute, or affected by a substantial and material error of law. [Quotations marks and citations omitted.[2]]

## B. PRINCIPLES OF STATUTORY CONSTRUCTION

In *AFSCME Local 3317*, 325 Mich App at 633-634, this Court set forth the principles of statutory construction:

The primary task in construing a statute is to discern and give effect to the Legislature's intent, and in doing so, we start with an examination of the language of the statute, which constitutes the most reliable evidence of legislative intent. When the language of a statutory provision is unambiguous, we must conclude that the Legislature intended the meaning that was clearly expressed, requiring enforcement of the statute as written, without any additional judicial construction. Only when an ambiguity in a statute exists may a court go beyond the statute's words to ascertain legislative intent. We must give effect to every word, phrase, and clause in a statute, avoiding a construction that would render any part of the statute nugatory or surplusage.

An agency charged with executing a statute is entitled to respectful consideration of its construction of that statute and should not be overruled absent cogent reasons; however, an agency's interpretation cannot bind the courts or conflict with the Legislature's intent as expressed in the statutory language.

---

[2] In *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 101; 754 NW2d 259 (2008), our Supreme Court elaborated with respect to the review of agency factfinding:

Review of an administrative agency's fact-finding is akin to an appellate court's review of a trial court's findings of fact in that an agency's findings of fact are entitled to deference by a reviewing court. In its fact-finding capacity, the agency has reviewed evidence, such as witness testimony, and it is in the best position to evaluate the credibility and weight of that evidence. Similar to the clear error standard of review for circuit courts, under the constitutional and statutory standards of review, a reviewing court must ensure that the finding is supported by record evidence; however, the reviewing court does not conduct a new evidentiary hearing and reach its own factual conclusions, nor does the reviewing court subject the evidence to review de novo. [Citation omitted.]

## C. DISCUSSION

Under the heading of "MANAGEMENT RIGHTS," the following provision is found in Section (3)(B) of the CBA that governed during the period at issue:

> Except as specifically limited by the provisions of the Agreement or applicable law, the Department will have unlimited discretion and authority:
>
> * * *
>
> 9. to establish, regulate, determine, revise, or modify at any time the policies, practices, protocols, processes, techniques, methods, means, and procedures used in the Department, including, but not limited to machinery, materials, methods, facilities, tools, and equipment[.]

There is no dispute by the parties that this language fully authorized the Department to take unilateral action with respect to the purchase and use of the Zoll Monitors. Instead, the crux of the dispute is whether a ULP occurred when data generated by the use of a Zoll Monitor was employed for investigative and disciplinary purposes in relation to alleged negligent conduct by the two employees in treating a patient during an emergency run.

The Union's position is that data from the Zoll Monitors, as distinguished from data from the Lifepak Monitors, provides information about the *quality* of any CPR performed on a patient, and that the data can inaccurately indicate neglect or improper care on the basis of strict application of AHA recommendations unconnected to the realities of a particular emergency. Such circumstances, according to the Union, effectively alter the character and type of evidence upon which an employee's job depends, thereby having a significant impact on the terms and conditions of employment. And this in turn means that use of data from the Zoll Monitors for investigative and disciplinary purposes constitutes a matter that is subject to mandatory collective bargaining. Stated more succinctly, the Union believes that Zoll Monitor data cannot be used as an evidentiary tool to establish neglect of duty in regard to the quality of CPR that was performed until collective bargaining on the subject takes place. Consequently, the parties need to negotiate an agreement setting evidentiary boundaries in order to protect employees from potential wrongful charges.

The CBA provided that the Department reserved "the right to discipline and discharge" an employee "for just cause." The CBA further indicated:

> The City . . . shall have the right to hire, suspend, discipline, discharge for cause, promote, demote, schedule, assign, transfer, layoff, recall, or relieve employees from duty for other legitimate reasons and to maintain discipline and efficiency among Employees; to establish work rules and rules of conduct; to fix and determine the penalties for the violation of such rules, provided they do not conflict with the terms of this Agreement. The Union shall have the right to grieve on the interpretation and application of these provisions.

With respect to the discipline and discharge of the two Department employees, Superintendent Larkins explained that he could tell from the data generated by the Zoll Monitor,

primarily the EKG, "that CPR was not being done . . . until [the patient] got to the hospital." He further testified that he could have similarly concluded that CPR had not been performed through review of data downloaded from a Lifepak Monitor had one been used in the case. Superintendent Larkins acknowledged that reviewing data from a Lifepak Monitor would not have allowed him to assess the adequacy or quality of CPR being performed, assuming that it had been performed. When asked by the Union's counsel to identify the protocol violation by the two employees relative to CPR, Superintendent Larkins responded, "As it relates to CPR, they weren't doing it" and "[t]hat's a huge violation."

When testifying about compression data from the Zoll Monitor, Superintendent Larkins observed:

> Which that data, the amount of compressions, how many per minute, all of that, could be pulled from an AED[3] as well. So the Lifepak . . . that we used prior to that, all of that has historically always been able to be retrieved from the devices that we use at the fire department. So that's nothing new with the Zoll [M]onitor.

He later reiterated that "the technology [has] always [been] there to be able to see if compressions are being done."[4] When the Union's attorney asked Superintendent Larkins, "[Y]ou found that they did not perform adequate CPR, correct?," he answered:

> That was one of the things that -- now, you said adequate CPR. I found that they didn't perform CPR until -- according to what I could see, until they got to the hospital. So that's what I could see. Until arrival to the hospital.

We also note that Captain Olkowski concluded that the data and other evidence revealed that the two employees had not performed CPR when responding to the emergency call. Additionally, Lieutenant Goodson found that the employees had not performed CPR.

The record is clear that with respect to CPR, the two Union members who lost their jobs were disciplined and discharged for failing to timely perform CPR and that the punishment had nothing to do with the *quality* of CPR. This undermines the entire premise of the Union's argument. Further, the record is equally clear that the conclusion that no CPR was performed could have been determined by examining EKG and other data from a Lifepak Monitor. And there has been no argument that data from a Lifepak Monitor could not be used in disciplinary proceedings under PERA. We conclude that no ULP occurred under the circumstances. Indeed, were we to rule otherwise, we would essentially be punishing the Department and the City for simply using new technology that plainly improved patient care. Yet the improvements in the

---

[3] AED stands for "automated external defibrillator."

[4] To be clear, Superintendent Larkins was not speaking of data from a Lifepak Monitor that could only be obtained with the addition of a separate device that the Department never purchased or used. Had such a device been used with the Lifepak Monitors, the quality of CPR could have been assessed through the display of depth and release velocity for compressions and the rates of compression.

technology that allowed for the recovery of data not previously available and that improved patient care were ultimately not used against the discharged employees. Accordingly, we hold that the use of Zoll Monitor data to discipline the employees for failure to perform CPR did not implicate mandatory collective bargaining. We find it unnecessary to determine whether mandatory collective bargaining arises when Zoll Monitor data is used to discipline an employee for not properly or adequately performing CPR, i.e., quality shortcomings, or for otherwise engaging in conduct that can only be detected by examining data from a Zoll Monitor and not a Lifepak Monitor.

MERC found that "[a]s with the use of data from drug tests, polygraph tests, and surveillance equipment, we conclude that the use of data from the Zoll [Monitor] *which had not been available from prior heart monitor/AED equipment* constituted a mandatory subject over which the Employer had a duty to bargain." (Emphasis added.) This ruling completely ignored the facts of record that data from a Lifepak Monitor, like data from a Zoll Monitor, could be used to establish that no CPR was performed in a given case. The important distinction here is that this was not a case that involved the quality of CPR. MERC's factual findings to the contrary were not supported by competent, material, and substantial evidence on the whole record.[5] Therefore, reversal is warranted.

We reverse and remand for entry of an order concluding that the City and the Department did not engage in a ULP by disciplining and discharging the two Union members. We do not retain jurisdiction. Having fully prevailed on appeal, the City may tax costs under MCR 7.219.

/s/ Michael F. Gadola
/s/ Jane E. Markey
/s/ Christopher M. Murray

---

[5] We note that the ALJ found that Zoll Monitors "provided information to which the Department did not previously have access, and which is relevant to employees' work performance." While this is true with respect to the quality of CPR performed on a patient, it is not true in regard to the question whether CPR was performed, which was the pertinent inquiry in this case because the two employees were discharged for failing to perform CPR. We recognize that Lieutenant Goodson referenced quality components of CPR in his report—depth and release velocity of compressions—but those were ultimately not relied on by Superintendent Larkins in discharging the employees.

-11-