*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

UNIVERSITY OF MICHIGAN (MEDICAL CENTER),

      Respondent-Appellant,

v

MICHIGAN NURSES ASSOCIATION,

      Charging Party-Appellee.

UNPUBLISHED
December 09, 2024
3:02 PM

No. 368893
MERC
LC No. 19-001855-CE

Before: GADOLA, C.J., and K. F. KELLY and REDFORD, JJ.

PER CURIAM.

In this case arising under Michigan's Public Employment Relations Act (PERA), MCL 423.201 *et seq.*, respondent University of Michigan (the University), appeals as of right the Michigan Employment Relations Commission's (MERC) decision and order concluding that the University's refusal to bargain over unilateral changes to parking arrangements on its medical campus violated § 10(1)(e) of the PERA, MCL 423.210(1)(e). Finding no errors warranting reversal, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The charging party, the Michigan Nurses Association (the MNA), represents approximately 5,700 nurses employed by the University at its medical campus. Relevant to the issues on appeal, the parties negotiated for approximately nine months and over 100 meetings before executing a collective-bargaining agreement (CBA) on October 10, 2018, with an expiration date of June 30, 2021. Approximately five months after the parties executed the 2018-2021 CBA, the University announced, via campus-wide e-mail, changes to employee parking at the University's main medical campus to increase the availability of parking for patients.

The primary building on the medical campus consists of various hospitals and medical centers connected by indoor walkways. The closest parking for these buildings are several enclosed parking structures, called the P1, P2, P3, P4, and P5 structures. Parking is also available further from the main medical campus on various surface lots, including the M71 and M29 lots. Shuttles are available to transport nurses and students across the main medical campus.

Employee parking in these parking structures and surface lots is organized by a color-coded permit system. Bargaining unit members, along with all other employees, have the option of purchasing one of four permits, ranked in descending value: Gold, Blue, Orange, and Yellow. Gold, the most expensive permit, costs over $1,800 per year and is only available to certain employees, such as physicians and executives. Gold permit holders are guaranteed a parking space and may park in any color-coded parking space. Blue is the second most expensive at $766 per year and entitles a permit holder to park in a Blue, Yellow, or Orange space. A Yellow permit costs $167 per year and entitles a permit holder to park in a Yellow or Orange space. Orange is the least expensive at $84 per year and only entitles a permit holder to park in Orange spaces. Unlike Gold permit holders, Blue, Yellow, and Orange permit holders are not guaranteed a parking space, only the opportunity to park in an available color-coded parking space.

The University announced in August 2019 that it would convert 280 Gold spaces in the P3 structure to patient/visitor parking and move those displaced Gold spaces across the street to the P4 structure. The University also announced the removal of 280 Blue spaces from the P4 structure to accommodate the new Gold spaces. Further out, the University announced it would convert 250 Yellow spaces in the M71 surface lot to Blue spaces and convert 48 valet parking spaces in the M29 surface lot to Blue spaces.

The MNA demanded to bargain over the parking changes. After the University refused the MNA's demand to bargain, the MNA filed an unfair-labor-practices charge with MERC in September 2019. While this case was pending, MERC issued a decision and order in *In re University of Michigan Health System and University of Michigan House Officers Associations*, MERC Decision & Order (Case No. 19-H-1721-CE), issued February 9, 2021 (hereinafter the HOA Case), which concluded that the University committed an unfair labor practice by failing to bargain with an unrelated labor organization regarding virtually the same parking changes.

Borrowing from its analysis in the HOA Case, MERC concluded that the parking changes implemented by the University implicated a mandatory subject of bargaining and significantly impacted a term or condition of the bargaining unit members' employment. MERC also concluded that the University did not fulfill its duty to bargain over the parking changes because the topic was not "covered by" the parties' CBA. MERC explained that no provision in the CBA could be reasonably relied on to cover the topic and the parties' history of negotiations did not show that the parties substantially discussed it. Finally, MERC concluded that the MNA did not waive the right to bargain over the topic. Given these conclusions, MERC held that the University violated § 10(1)(e) of the PERA. Among other relief, MERC ordered the University to cease and desist from refusing to bargain collectively with the MNA, to restore the status quo from before the University implemented the parking changes, and to make bargaining unit members whole for monetary losses incurred as a result of the unilateral parking changes with interest.

This appeal followed.

## II. STANDARD OF REVIEW

We review MERC's decisions under the deferential standard stated in 1963 Const, art 6, § 28 and MCL 423.216(e). *Calhoun Intermediate Sch Dist v Calhoun Intermediate Ed Ass'n*, 314 Mich App 41, 46; 885 NW2d 310 (2016). "MERC's factual findings are conclusive if supported

by competent, material, and substantial evidence on the whole record." *Macomb Co v AFSCME Council 25*, 494 Mich 65, 77; 833 NW2d 225 (2013) (quotation marks and citation omitted). We review MERC's legal rulings de novo, but we may only set aside those legal rulings "if they are in violation of the constitution or a statute, or affected by a substantial and material error of law." *Id*. (quotation marks and citation omitted).

III.  ANALYSIS

The PERA governs public-sector labor relations. *Id*. at 77-78. Section 15 of the PERA requires public employers to bargain in good faith over mandatory subjects of bargaining. *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 54-55; 214 NW2d 803 (1974). A public employer commits an unfair labor practice if it refuses to bargain in good faith over a mandatory subject of bargaining or takes unilateral action on the subject absent an impasse in negotiations. *Port Huron Ed Ass'n, MEA/NEA v Port Huron Area Sch Dist*, 452 Mich 309, 317; 550 NW2d 228 (1996); MCL 423.210(1)(e). A public employer may defend against a charge that it unilaterally altered a term or condition of employment by showing that it fulfilled its duty to bargain or that the union waived its right to demand bargaining. *Port Huron Ed Ass'n*, 452 Mich at 318.

A.  MANDATORY SUBJECT OF BARGAINING

The University first argues that the redesignation of parking spaces on the main medical campus did not implicate a mandatory subject of bargaining because the changes had a *de minimis* impact on bargaining unit members. Concluding that competent, material, and substantial evidence supported MERC's holding that the parking changes had a significant impact on the terms and conditions of bargaining unit members' employment, we disagree.

A public employer's duty to bargain in good faith extends to "wages, hours, and other terms and conditions of employment." MCL 423.215(1). Subjects within the phrase, "wages, hours, and other terms and conditions of employment," are mandatory subjects of bargaining. *Detroit Police Officers Ass'n*, 391 Mich at 54. What constitutes a mandatory subject is "determined on a case-by-case basis." *Oak Park Pub Safety Officers Ass'n v Oak Park*, 277 Mich App 317, 325; 745 NW2d 527 (2007). "[A]ny matter that has a *significant* impact on wages, hours, or other conditions of employment is subject to mandatory bargaining." *Id*. Section 15 of the PERA was modeled after § 8 of the National Labor Relations Act (NLRA), 29 USC 158(d). *Local 1383 Int'l Ass'n of Fire Fighters v City of Warren*, 411 Mich 642, 652; 311 NW2d 702 (1981). Our Supreme Court, noting that the language of these PERA and NLRA provisions are virtually identical, has explained, "Michigan cases have followed Federal decisions and have adopted a broad and expansive interpretation of wages, hours, and other terms and conditions of employment. *Id*. (quotation marks and citation omitted).

In this case, MERC, relying on analogous federal decisions, held that employee parking is a mandatory subject of bargaining where the change in an employer's parking policy significantly affects employees' terms and conditions of employment. See *In re United Parcel Serv*, 336 NLRB 1134 (2001); *Success Village Apartments*, 348 NLRB 579 (2006). MERC also held that the parking changes were material changes, triggering a duty to bargain. Noting that the University does not contest MERC's holding that employee parking is a mandatory subject of bargaining, we

address the University's argument that the unilateral parking changes were *de minimis* and did not trigger a duty to bargain.

After review of the whole record, we conclude that competent, material, and substantial evidence supports MERC's holding that the parking changes were significant. See *Macomb Co*, 494 Mich at 77. The availability of employee parking was already an issue before the unilateral parking changes. The P1 and P4 structures, as well as the M71 lot, filled to capacity between 5 a.m. and 6:30 a.m. each day. Some bargaining unit members arrived for their morning shift up to 90 minutes early to "hunt" for a parking space in the P4 structure. Before the parking changes, the P4 structure had 792 Blue spaces. This number was reduced to 512. The parking changes made the "hunt" for the reduced number of spaces more competitive.

The reduction of Blue spaces in the P4 structure resulted in more Blue permit holders parking in the surface lots, such as the M71 and M29 lots. Depending on the bargaining unit member's worksite, these surface lots were further from the entrances to the main medical campus, leaving bargaining members to walk a greater distance in varying states of Michigan weather. This includes longer exposure to potentially icy sidewalks and frigid cold. Likewise, unlike the parking structures, the M71 and M29 lots are surface lots, which leave vehicles exposed during the workday to the accumulation of ice and snow that requires more time and effort to remove before leaving work. Moreover, the M71 lot is a gravel lot that does not get plowed in the winter. This evidence supports that the parking changes increased the commute time and affected the quality of available parking.

Although bargaining unit members had access to free shuttles that stop at or near the lots, these shuttles are often crowded with students, resulting in bargaining unit members waiting for two or three buses before embarking. Only one nurse-only shuttle is available to transport nurses to the East Ann Arbor campus. The combination of the wait time and commute on the bus added between 30 to 90 minutes to the workday.

The parking changes also affected the value of parking permits. Blue permit holders, who were able to access enclosed parking directly adjacent to the main medical campus, continued to pay $766 to park further from the building and in surface lots. Additionally, as a result of relocation of 250 Blue spaces into the once entirely Yellow M71 surface lot, employees who paid $167 per year to park in M71, now had to pay $766 to remain in that lot.

This record supports that the parking changes had a cascading effect on bargaining unit members, impacting the length of their workday commute, the quality of the parking available, and the value of their parking permits.[1] MERC's determination that the parking changes had a

---

[1] We acknowledge the University's reliance on previous decisions of MERC and the National Labor Relations Board to support its proposition that the parking changes in this case had a *de minimis* effect on bargaining unit members. See *City of Southfield (Police Department)*, 1993 MERC Lab Op 87; *Berkshire Nursing Home LLC*, 345 NLRB 220 (2005). Noting that whether a subject is mandatory is determined on a case-by-case basis, see *Oak Park Pub Safety Officers Ass'n*, 277 Mich App at 325, none of the decisions cited by the University undermine our conclusion in this case.

significant impact on bargaining unit members was supported by competent, material, and substantial evidence. See *id*. Accordingly, the University had a duty to bargain with the MNA before unilaterally implementing the parking changes.

## B. THE "COVERED BY" DOCTRINE

The University next argues that it reasonably relied on the language of the parties' CBA to implement the parking changes. Concluding that neither the language of the CBA nor the parties' history of negotiations support that the topics related to the parking changes were "covered by" the parties' CBA, we disagree.

A public employer may fulfill its duty to bargain over a topic "by negotiating for a provision in the collective bargaining agreement that fixes the parties' rights and forecloses further mandatory bargaining . . . ." *Port Huron Ed Ass'n*, 452 Mich at 318 (quotation marks and citation omitted). In such a case, the topic is "covered by" the CBA and the "details and enforceability of the provision are left to arbitration." *Id*. at 321. To determine whether a topic is "covered by" the parties' CBA, MERC examines whether the agreement contains provisions that can be "reasonably relied on" for the matter in dispute. *Id*. (quotation marks and citation omitted).

In *Port Huron Ed Ass'n*, our Supreme Court provided guidance for when a topic is "covered by" an agreement. The employer in that case unilaterally prorated insurance benefits. *Id*. at 313. The union did not dispute that the parties' CBA provided for the proration of insurance benefits, but did disagree with the employer regarding the interpretation and application of the provision. *Id*. at 320. Because the union did not dispute that the topic was addressed by the CBA, the Court determined that "under any reasonable definition of the term 'covered by' " the prorating of insurance benefits was "covered by" the CBA. *Id*. at 324. The Court explained, "[a] subject need not be explicitly mentioned in an agreement in order for the subject to be 'covered by' the agreement." *Id*. at 322 n 16. However, the Court declined to "address the outer limits of when a subject is 'covered by' an agreement." *Id*. at 324.

The Court distinguished the case from its earlier decision in *Amalgamated Transit Union Local 1564 v Southeastern Mich Transp Auth*, 437 Mich 441; 473 NW2d 249 (1991). In *Amalgamated*, the charging party asserted that the employer unilaterally altered a term or condition of employment when it refused to bargain regarding a change in the disciplinary procedure for probationary employees. *Port Huron Ed Ass'n*, 452 Mich at 325 n 19. The parties' CBA contained several provisions addressing probationary employees, including a provision giving the employer sole discretion to discharge probationary employees. *Id*. However, the agreement did not specifically address disciplining probationary employees. *Id*. Even though the CBA contained provisions addressing some probationary employee topics, the Court concluded that those references were insufficient for the dispute to be "covered by" the CBA. *Id*. As suggested by the Court's analysis of the CBAs in *Amalgamated* and *Port Huron Ed Ass'n*, reference to some matters related to a subject may be insufficient to conclude that all matters concerning that subject are covered by the CBA.

This Court has also analyzed the boundaries of the "covered by" doctrine in a dispute between an employer and union regarding the employer's decision to change from a specific dental insurance carrier to a self-insured program. *Gogebic Community College Mich Ed Support*

*Personnel Ass'n v Gogebic Community College*, 246 Mich App 342; 632 NW2d 517 (2001). In that case, the parties' CBA generally provided that the employer would maintain a specified level of dental insurance and employee premiums, but did not provide that the employer must use a specified dental insurance carrier. *Id*. at 350. The CBA also included language that the employer must use specified health and vision insurance carriers. *Id*. On the basis of the health and vision carrier provisions, this Court concluded that the parties fulfilled their duty to bargain over the topic of insurance carriers during negotiations. *Id*. Given the evidence of the parties' negotiations history, the lack of explicit mention of a dental insurance carrier supported that the parties chose not to obligate the employer to maintain a specific dental carrier. *Id*.

Although a topic need not be explicitly addressed to be "covered by" a CBA, the CBA in this case is more akin to the CBA in *Amalgamated* than *Gogebic*. *Port Huron Ed Ass'n*, 452 Mich at 324. The University asserts it reasonably relied on the Management Rights provision and a Parking Memorandum of Understanding (MOU) to relieve it of its duty to bargain. The Management Rights provision broadly states that the University retains the right to "control the management of the University," including "the control of property," and the "right to change or introduce new operations, methods, processes, means or facilities." The Parking MOU addresses discrete parking issues, including shuttle services for off-site parking; lighting and security escorts; sheltering of parking lots; snow and ice removal, parking for employees who carpool or vanpool; disciplinary consequences for employees who are tardy as a result of struggles to find parking; and appointing a bargaining unit member to participate in the Parking and Transportation Advisory Committee (PTAC).

The Management Rights provision makes no mention of parking. Its language broadly concerns "control of operations" and "property," which cannot reasonably be read to vest the University with unilateral control over the topic of employee parking. Although the Parking MOU mentions several parking topics, these issues are discrete and extraneous to the parking changes at issue. Neither provision mentions employee parking generally, or more specifically mentions the tiered parking permit system, the cost or location of employee parking, or the right to reallocate employee parking on the main medical campus. Like *Amalgamated*, the mention of some parking topics is insufficient to conclude that topics related to the parking changes are "covered by" the CBA. Further, unlike *Gogebic*, where it was clear from the CBA language that the parties' history of negotiations included discussion of specific insurance carriers, the CBA in this case contains no language that suggests a history of negotiations addressing the parking topics at issue. Accordingly, the language of the parties' CBA did not "cover" the parking changes made by the University.

Moreover, a review of the parties' history of negotiations for the 2018-2021 CBA shows that the parties did not substantively discuss the parking topics to support a conclusion that the parties bargained over the topic. The parties engaged in "interest-based bargaining," in which each party identified a list of options for a particular topic. During this process, the parties rated options, ranging from acceptable to include in the CBA to unacceptable to include in the CBA. During negotiations, the MNA offered 34 options related to parking. None of the MNA's 34 options addressed topics related to the parking changes. The University offered no options on the topic of parking and rated almost all of the MNA's parking options as unacceptable or inappropriate. The only parking issues on which both parties agreed were discussed and ultimately included in the

Parking MOU. As previously noted, the Parking MOU addressed limited parking issues unrelated to the parking changes.

The parties' negotiations do not warrant the conclusion that the parties substantively discussed topics related to the parking changes and that the parties understood their agreement to impose no restrictions on the University's right to change employee parking. Instead, the evidence demonstrates that the parties did not discuss topics related to the parking changes. Had the University desired to establish its right to change employee parking, it could have presented options related to the parking changes during negotiations. The failure to do so supports the conclusion that the Parking MOU embodied all of the topics the parties substantively discussed.

The only mention of topics related to the parking changes during negotiations was by parking experts employed by the University. In a presentation regarding parking on campus, an expert stated that "they" were considering changing the Yellow spaces in the M71 lot to Blue spaces and that Blue spaces would be removed from the P4 parking structure. However, this statement was qualified by adding "it was just a discussion point at that time" and the change was part of "projects to be considered in the future." Given that the only mention of topics related to the parking changes was limited to stray commentary regarding future projects, this evidence did not support that the CBA covered the parking issues in dispute. Considering both the language of the CBA and the parties' negotiating history, the parking changes were not "covered by" the CBA.

## C. WAIVER

Finally, the University argues that during negotiations for the 2018-2021 contract, the MNA had notice that the University intended to make the parking changes and ceded authority to the University to implement those changes. Concluding that the record evidence does not support that the MNA waived its right to bargain, we disagree.

The University essentially argues that the MNA ceded the University authority through inaction. Although the University addressed this argument under the "covered by" doctrine, the University has raised a waiver argument. In *Port Huron Ed Ass'n*, the Supreme Court explained that the "covered by" doctrine and waiver are distinct:

> A waiver occurs when a union knowingly and voluntarily relinquishes its right to bargain about a matter; but where the matter is covered by the collective bargaining agreement, the union has exercised its bargaining right and the question of waiver is irrelevant. [*Port Huron Ed Ass'n*, 452 Mich at 319 (quotation marks and citation omitted).]

The Court further explained that waiver must be "clear and unmistakable" to support that a union has waived the right to bargain regarding a topic. *Id*. at 319-320.

The waiver provision in the parties' CBA provides, in relevant part:

> The University and the Association acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the

-7-

understanding and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement.

This provision does not contain "clear and unmistakable" language expressing that the MNA waived its right to bargain over parking changes. Likewise, the provision does not contain "clear and unmistakable" language expressing that the MNA can waive its right to bargain through inaction.

Moreover, the record does not support that the MNA knew or had reason to know during negotiations that the University planned to make the parking changes. The University argues that the MNA should be charged with knowledge of the University's position regarding the parking changes because the MNA was aware that the PTAC published a final report recommending some of the parking changes implemented by the University during the 2018-2021 negotiations and a member of the MNA participated in the PTAC's meetings.

The PTAC was an advisory committee formed by the University to study parking issues and make recommendations to the University. The PTAC held meetings and issued several reports contemporaneous with the 2018-2021 CBA negotiations. Laura Jirasek, a district representative and member of the House of Delegates, participated in the committee and ultimately gave Benjamin Curl, a labor relations representative for the MNA, a copy of the PTAC's final report sometime in or after July 2018.

Although the MNA was aware of the PTAC, on the record before this Court, that awareness is not sufficient to show that the MNA knew or should have known the University's position regarding the parking changes. The PTAC was a self-described advisory committee assembled with the purpose of reviewing current parking, "providing recommendations for continued improvement," and "assisting in the review and possible recommendation of new policies and procedures related to appropriate parking use." The PTAC did not make itself out to represent the University's actual position on parking issues during negotiations. The record contains no evidence that the University provided the MNA with a copy of the final report or that its views were represented by the PTAC's final report.

Moreover, the University did not immediately implement the parking changes after the PTAC issued its final report. Instead, the University waited over a year before announcing the parking changes and did not implement parking changes exactly as recommended by the PTAC. When the MNA received notice of the University's intent to implement the parking changes five months after the end of negotiations, the MNA immediately demanded to bargain. These facts further supported that the PTAC did not represent the University's position on parking and only acted as an advisory committee. Accordingly, the record does not contain "clear and unmistakable" evidence that the MNA waived the right to bargain over topics relevant to the parking changes. See *id.*

## IV. CONCLUSION

The unilateral parking changes implicated a mandatory subject of bargaining and those changes had a significant impact on the terms and conditions of bargaining unit members' employment. The parties' CBA did not cover the subject and the MNA did not waive the right to

bargain regarding the subject. Accordingly, we affirm MERC's decision and order concluding that the University's refusal to bargain over unilateral parking changes violated § 10 of the PERA.

Affirmed.

/s/ Michael F. Gadola
/s/ Kirsten Frank Kelly
/s/ James Robert Redford